DAVID MARK PRUETT

V.

COMMONWEALTH OF VIRGINIA

Record no. 860478

DAVID MARK PRUETT

V.

COMMONWEALTH OF VIRGINIA

Record No. 860499

November 26, 1986

Present: All the Justices

*Moody E. Stallings, Jr. (Deborah L. Rawls; Stallings and Richardson, on brief), for appellant. (Record Nos. 860478 and 860499)*

*Robert H. Anderson, III, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee. (Record Nos. 860478 and 860499)*

CARRICO, C.J., delivered the opinion of the Court.

On July 1, 1985, David Mark Pruett was indicted for capital murder in the killing of Wilma L. Harvey during or subsequent to the commission of rape. Pruett was also indicted for the rape and robbery of Mrs. Harvey. In the first phase of a bifurcated trial conducted pursuant to Code § 19.2-264.3, a jury convicted Pruett of all three charges and fixed his punishment for rape at life imprisonment and for robbery at seventy-five years' imprisonment. In the second phase of the trial, the jury heard evidence in aggravation and mitigation of the murder charge and fixed Pruett's punishment on that charge at death. Following consideration of a pre-sentence report, the trial court imposed the sentences fixed by the jury.

Pruett appealed his convictions for rape and robbery to the Court of Appeals. Pursuant to Code § 17-116.06, we certified those charges to this Court and consolidated them with Pruett's appeal of his murder conviction and the automatic review of his death penalty under Code § 17-110.1.

## I. Pretrial Matters

### A. Motion to Suppress

In a pretrial motion, Pruett sought to suppress "all statements, confessions or admissions" he made to the police concerning the crimes in question. The trial court denied the motion, and this denial is the subject of Pruett's principal assignment of error.

The record shows that shortly before noon on February 13, 1985, the nude, mutilated body of Wilma L. Harvey was found on a bed in the home she shared with her husband, Richard, in Virginia Beach. Richard was out of town on a business trip at the time his wife was killed.

Evidence at the suppression hearing shows that in the early stages of their investigation, police officers learned from witnesses

that Pruett's automobile was parked in front of the Harvey residence on the evening of February 12, preceding the discovery of Mrs. Harvey's body. The police also learned that Pruett was a close friend of the Harveys.

Shortly after midnight on February 14, a detective was dispatched to Pruett's home to ask him "if he would accompany" the detective to police headquarters "for an interview." Pruett was transported to headquarters, where he was interviewed by Sergeant J. T. VanderHeiden in a session lasting about 90 minutes. VanderHeiden did not give Pruett the warnings outlined in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), prior to any questioning.

During the interview, which was recorded and transcribed, Pruett admitted he visited Wilma Harvey on the evening of February 12, but he denied killing her. He said he left the Harvey residence about 5:45 p.m. VanderHeiden had information, however, that placed Pruett's car in front of the Harvey home somewhat later than 5:45.[1] When this apparent conflict developed, VanderHeiden read Pruett his *Miranda* rights. Pruett signed a waiver stating he understood his rights and was willing to make a statement and answer questions without a lawyer present.

The interview ended some 20 to 30 minutes after the waiver was signed with VanderHeiden requesting Pruett to "give [the police] a call if he had any additional information." Pruett then left police headquarters and was driven home by a detective.

Later in the day on February 14, VanderHeiden learned that Pruett's fingerprints had been found on the inside of the right lens of eyeglasses worn by Wilma Harvey and on the headboard of the bed on which her body was found. VanderHeiden dispatched a detective to Pruett's home with instructions to ask him to accompany the detective to police headquarters, "the same as the first interview." Pruett was not arrested "at that time." He arrived at police headquarters about 3:45 p.m. Prior to questioning, VanderHeiden advised Pruett of his *Miranda* rights and Pruett signed a waiver stating he understood his rights and was willing to make a statement and answer questions without a lawyer present.

The second interview, which was videotaped, lasted some 4½ hours. During the interview, Pruett not only confessed to the rape,

---

[1] VanderHeiden testified he had information indicating that Pruett's car was parked in front of the Harvey residence as late as 8:00 p.m. on February 12. VanderHeiden testified further, however, that it turned out his information was incorrect and that Pruett was "telling the truth" about the time his car was parked in front of the residence.

robbery, and murder of Wilma Harvey but also volunteered the information that in 1975, he robbed and murdered Debra McInnis, the assistant manager of a Kentucky Fried Chicken store. At the end of the interview, Pruett was arrested, placed in handcuffs, and transported to a magistrate.

Pruett testified at the suppression hearing that he did not feel he was free to leave during the 1:00 a.m. interview on February 14. He admitted, however, that he was told he was not under arrest at the time of the interview, and he said that he did, "in fact," leave when the interview was completed.

On appeal, Pruett contends that "the first interview was a custodial interrogation to which *Miranda* applied." Pruett argues that because he was not advised of his *Miranda* rights at the beginning of the first interview and the police gained, during that "initial improper interrogation," incriminating information which was used to secure his confession during the second interrogation, the confession was tainted by the illegality of the earlier confrontation.

It is well settled, Pruett maintains, that a confession secured after an earlier incriminating statement has been illegally obtained should be held inadmissible, absent a demonstration by the prosecution that the second statement was not "a product of the earlier unwarned and coerced confession." Then, quoting from *United States* v. *Bayer*, 331 U.S. 532, 540 (1947), Pruett metaphorizes that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed" and "can never get the cat back in the bag." Pruett concludes that the Commonwealth should be made to "suffer the consequences" of the police failure to advise him of his rights and the only appropriate sanction is the suppression of the incriminating statements he made in both interviews.

We disagree with Pruett. *Miranda* applies only to "custodial interrogation," which means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. *Miranda* does not affect "general questioning of citizens in the fact-finding process." *Id.* at 477. Neither is the application of *Miranda* triggered "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon* v.

*Mathiason*, 429 U.S. 492, 495 (1977). *Miranda* warnings are required "only where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Id.*

In denying Pruett's motion to suppress, the trial court found that Pruett was "not under arrest" at the time of the first interview, that he "knew from the beginning . . . he was not under arrest," and that he was "free to leave at any time" during the interview. The court concluded that Pruett's initial meeting with the police was "noncustodial questioning," not "a custodial interview," and, therefore, that it was not necessary for the police to advise Pruett of his *Miranda* rights prior to questioning.

These findings of the trial court are amply supported by the evidence. Sergeant VanderHeiden testified without contradiction at the suppression hearing that although he considered Pruett "a suspect," he did not advise Pruett of his *Miranda* rights because he was not a "concrete suspect" and the police had "nothing to indicate that he was the person who had killed Wilma." VanderHeiden said that Pruett "and just about everybody else in the City of Virginia Beach was a suspect at that time."

VanderHeiden testified further that Pruett was not under arrest at the time of the interview, was told he was not under arrest, and was told he was not a suspect. Pruett was not booked on any charge, according to VanderHeiden, and he was not under any physical restraint. When asked what he would have done had Pruett said he wanted to leave, VanderHeiden replied that he "would [have] let him leave."

■ We think the record of the suppression hearing demonstrates clearly that Pruett was not in custody at the time of the first interview and that he was subjected only to "general questioning . . . in the fact-finding process." *Miranda*, 384 U.S. at 477. Hence, the police were not required to give Pruett the *Miranda* warnings before commencing questioning. *See Coleman* v. *Commonwealth*, 226 Va. 31, 47, 307 S.E.2d 864, 873 (1983), *cert. denied*, 465 U.S. 1109 (1984); *Smith* v. *Commonwealth*, 219 Va. 455, 470, 248 S.E.2d 135, 144 (1978), *cert. denied*, 441 U.S. 967 (1979). But even if we assume that *Miranda* warnings were required before questioning commenced in the first interview, our opinion with respect to the admissibility of the confession obtained at the second confrontation would remain the same.

■ In *Oregon* v. *Elstad*, 470 U.S. 298 (1985), the accused made an incriminating statement while in custody without benefit

of *Miranda* warnings. Approximately one hour later, the accused was advised of his *Miranda* rights and made a full confession. He contended that the confession was tainted by the earlier failure of the police to give him the *Miranda* warnings, and he relied upon the "cat out of the bag" metaphor to support the contention. The Court rejected both the contention and the metaphor, holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318.

We recently applied *Elstad* to approve the admission of confessions in *Poyner* v. *Commonwealth*, 229 Va. 401, 408-09, 329 S.E.2d 815, 822, *cert. denied*, 474 U.S. 865 (1985), and *Boggs* v. *Commonwealth*, 229 Va. 501, 512-13, 331 S.E.2d 407, 416 (1985), *cert. denied*, 475 U.S. 1031 (1986), both death penalty cases. *Poyner* involved a contention that a second confession was tainted because the first was preceded by allegedly defective *Miranda* warnings. In *Boggs*, the defendant claimed that his confession was inadmissible because an earlier incriminating statement was unwarned.

Pruett says he is "aware of " *Elstad*, and he stresses in his brief this passage from the Supreme Court's opinion:

The Court today in no way retracts from the bright-line rule of *Miranda*. We do not imply that good faith excuses a failure to administer *Miranda* warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him.

470 U.S. at 317. Pruett then argues:

[T]he police in this case set out on a course of action knowing full well that if they advised [Pruett] initially of his rights under *Miranda*, they would not have gotten the information that they were seeking. It was a deliberate, bad faith plan on the part of the police to solicit inculpatory information in the initial 1:00 a.m. unwarned custodial interrogation, and then to try and cleanse themselves by letting [Pruett] go home for several hours and then picking him up again for the warned, so-called voluntary 3:45 p.m. interrogation.

The difficulty with this argument is that it finds absolutely no support in the record. An examination of the record reveals nothing to suggest that the police tactics in this case even approached the type condemned in the passage from *Elstad* quoted above, *i.e.*, those which "render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him." *Id.*

■ Rather, the language of *Elstad* immediately following the passage quoted above is pertinent here:

A handful of courts have, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary. Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.

*Id.* at 317-18 (footnote omitted). In this case, even assuming that a technical *Miranda* violation occurred in the initial interview, we have no difficulty finding that the statements made in both interviews were clearly voluntary and, hence, admissible.

### B. Motions for Psychiatric Evaluation

In a pretrial motion filed pursuant to Code §§ 19.2-169.1 and -169.5, Pruett asked the trial court to order a psychiatric evaluation at state expense to determine whether his "actions during the time of the alleged offense may have been affected by mental disease or defect." The court appointed Dr. Thomas K. Tsao to evaluate Pruett "concerning [his] mental state at the time of the offenses, including whether he may have had a significant disease or defect which rendered him insane at the time of the offenses, and his competency to understand the nature of these proceedings."

After Dr. Tsao submitted his report,[2] defense counsel moved the court to appoint another psychiatrist to evaluate Pruett "on the

---

[2] At the time of the proceedings below, Code § 19.2-169.5(E) provided that a summary of the evaluation "shall be sent to the attorney for the Commonwealth and the court" and

issue of his sanity and ability to withstand trial." Counsel's sole basis for this motion was that Dr. Tsao's evaluation took only about "one hour's time" and, hence, was "inadequate." The court denied the motion.

Then, approximately one month before trial, Pruett made another motion for the appointment of a psychiatrist. This time, defense counsel told the trial court that Pruett only recently had informed counsel of his wartime experiences in Viet Nam. Counsel admitted that Pruett had told Dr. Tsao of his Viet Nam experiences, but counsel asserted that because Dr. Tsao was "of oriental nationality," he would be prejudiced against Pruett for "the things" Pruett had done in Viet Nam. Counsel told the court that the defense desired an evaluation of Pruett by a psychiatrist recognized as an authority in the "phenomenon . . . known in psychiatric circles as delayed stress syndrome" and that Dr. Tsao was not such an authority.

Pruett took the witness stand briefly to tell the court that he served with the Army in Viet Nam for about a year. Pruett said he was a cook on a transport vessel that "went up and down the coast," but that he was also a soldier "every other day," serving on shore duty and engaging in combat.

The trial court denied Pruett's motion. Pruett maintains that this was error, that the denial of his second evaluation "in effect prevented [him] from developing facts in mitigation of the offense as is authorized in the capital sentencing statute, Va. Code § 19.2-264.4(B)."

Furthermore, Pruett says, the General Assembly, in response to *Ake* v. *Oklahoma*, 470 U.S. 68 (1985),[3] has enacted Code § 19.2-264.3:1, entitled "Expert assistance when defendant's mental condition relevant to capital sentencing." Pruett quotes a portion of this section which states in Paragraph (A) that, on motion of

---

that the full report "shall be sent solely to the attorney for the defendant and shall be deemed to be protected by the lawyer-client privilege." *Amended by* Acts 1986, ch. 535. Neither the summary nor the full report is contained in the record. Since Pruett was not satisfied with the report and has not informed us of its contents, we must assume it was not helpful to him.

[3] *Ake* holds that an indigent accused must be provided psychiatric assistance in the penalty stage of a capital murder trial "when the State presents psychiatric evidence of the defendant's future dangerousness." 470 U.S. at 83. Here, the Commonwealth did not present psychiatric evidence of Pruett's future dangerousness in the penalty stage of the case. *Ake*, therefore, is inapposite.

counsel for an indigent in a capital murder case, a trial court shall:

> [A]ppoint one or more qualified mental health experts to evaluate the defendant and to assist the defense in the preparation and presentation of information concerning the defendant's history, character, or mental condition, including . . . (iii) whether there are any other factors in mitigation relating to the history or character of the defendant or the defendant's mental condition at the time of the offense.

Pruett does not argue that the foregoing section actually required the trial court to appoint a second psychiatrist to evaluate him but that the "one or more" language authorized the court to make such an appointment in the exercise of its discretion. The denial of his motion, Pruett maintains, was an abuse of discretion.

We do not think the trial court abused its discretion. We agree with the Attorney General that the trial court's appointment of Dr. Tsao provided Pruett "all that he was constitutionally or statutorily entitled to."

The order appointing Dr. Tsao specifically directed that he was to include in his report "any . . . mitigating circumstances." The order also directed the doctor to "assist in evaluation, preparation and presentation of the defense as necessary." This language was inclusive enough to require Dr. Tsao's assistance in the penalty stage of the trial.

The trial court made a specific finding that Dr. Tsao was a competent physician, based upon the court's prior experience with Dr. Tsao "on other instances." Pruett told Dr. Tsao about his wartime experiences in Viet Nam, and there is nothing in the record except defense counsel's argument even hinting that the doctor would not have given an unbiased opinion concerning those experiences, even though he was, by Pruett's description, "of oriental nationality."

The fact that Pruett may not have received from Dr. Tsao the opinion he wanted is completely immaterial. Pruett does not have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83; *Tuggle* v. *Commonwealth*, 230 Va. 99, 107, 334 S.E.2d 838, 843 (1985). Put another way, Pruett has no right to "shop around" at state expense until he finds a doctor who will give him the opinion

he wants. *Turner* v. *Bass*, 753 F.2d 342, 350 n.7 (4th Cir. 1985), *rev'd on other grounds sub nom. Turner* v. *Murray*, 476 U.S. ___, 106 S.Ct. 1683 (1986).

## C. Motions Concerning Jury

On the morning of trial, Pruett moved the trial court to impanel two juries, one to determine guilt, and, in the event of conviction, one to determine punishment. Pruett argued that it was "against [his] constitutional rights and rights to fair trial that [the] jury be death qualified before it even determines the issue of guilt and innocence." The court denied the motion.

Pruett acknowledges that in *Watkins* v. *Commonwealth*, 229 Va. 469, 479-80, 331 S.E.2d 422, 431 (1985), *cert. denied*, 475 U.S. 1099 (1986), we upheld the constitutionality of the provision in Virginia's death penalty statutes for the use of the same jury in both the guilt and punishment stages of a capital trial.[4] Pruett says, however, that the accused in *Watkins* contended that "once a jury finds a man guilty of a capital offense, it is incapable of impartiality in fixing his punishment." *Id.* at 479, 331 S.E.2d at 431. His contention, Pruett says, is different: a jury which has been "death qualified" and hence capable of fixing punishment is incapable of impartiality in determining guilt or innocence.

■ We disagree. In *Waye* v. *Commonwealth*, 219 Va. 683, 690-91, 251 S.E.2d 202, 207, *cert. denied*, 442 U.S. 924 (1979), we rejected the argument that "a defendant's rights to due process and an impartial trial under the Fifth, Sixth and Fourteenth Amendments" are violated by the use of death-qualification questions during *voir dire* in a capital murder case. And in *Lockhart* v. *McCree*, 476 U.S. ___, 106 S.Ct. 1758 (1986), the United States Supreme Court recently rejected the argument that "the very process of questioning prospective jurors at *voir dire* about their views of the death penalty violates the Constitution." *Id.* at ___, 106 S.Ct. at 1763 n.7. The Court said the states have an "entirely proper interest in obtaining a single jury that could impartially decide all of the issues in [a capital murder] case," *id.* at

---

[4] We noted in *Watkins* that use of the same jury to determine both guilt and punishment has been held constitutional by the United States Supreme Court in *Gregg* v. *Georgia*, 428 U.S. 153 (1976), and *Jurek* v. *Texas*, 428 U.S. 262 (1976). 229 Va. at 480, 331 S.E.2d at 431.

_____, 106 S.Ct. at 1768, and that the process of "death qualification" of jurors is proper even assuming it "produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries," *id.* at _____, 106 S.Ct. at 1764.

■ After the trial court denied Pruett's motion for two juries, he moved the court to permit him to plead guilty and submit to the jury the question of punishment alone. The court denied this motion. The court's action was correct. Rule 3A:13(a) provides that "[t]he accused is entitled to a trial by jury only in a circuit court on a plea of not guilty."

Pruett points out, however, that Rule 3A:18 provides that "[t]he trial of capital cases shall proceed in accordance with the provisions of Article 4.1 of Chapter 15 of Title 19.2 [Code §§ 19.2-264.2 to -264.5] and, except to the extent conflicting therewith, the provisions of this Part Three A shall be applicable thereto." Pruett argues that because Article 4.1 of Chapter 15 of Title 19.2 "provides for a bifurcated trial, with a separate hearing on the issue of punishment, . . . he is entitled to a jury on the issue of punishment alone following a plea of guilty on all charges to the court."

But there is no provision in Article 4.1 of Chapter 15 of Title 19.2 concerning the entry by an accused of a plea of guilty in a capital murder case. There is no conflict, therefore, between Article 4.1 and Rule 3A:13(a), and, hence, pursuant to Rule 3A:18, "the provisions of . . . Part Three A shall be applicable [to the entry of a plea of guilty in a capital case]."

### D. Jury Selection

#### 1. *Voir Dire* Questions

During *voir dire*, defense counsel requested permission to ask prospective jurors whether they understood "that should their verdict not be unanimous, then the Court would impose [a] proper sentence." The trial court denied the request.

Pruett argues that the proposed question contained an accurate statement of Virginia law concerning the action to be taken when a jury is unable to agree on sentence in a capital case.[5] Pruett maintains that the door was opened for the question when the

---

[5] Code § 19.2-264.4(E) provides that "[i]n the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life."

court permitted the Commonwealth's Attorney to ask the prospective jurors whether they understood "the jury must be unanimous in its verdict that the death penalty is the appropriate sentence in the case."

In *Justus v. Commonwealth*, 220 Va. 971, 266 S.E.2d 87 (1980), *cert. denied*, 455 U.S. 983 (1982), we affirmed the trial court's refusal of a defense instruction which would have told the jury that "if it could not reach agreement as to the appropriate punishment, the court would dismiss it and impose a life sentence." *Id.* at 979, 266 S.E.2d at 92. We said that "[w]hile this was a correct statement of law it concerned a procedural matter and was not one which should have been the subject of an instruction" because "[i]t would have been an open invitation for the jury to avoid its responsibility and to disagree." *Id.*

The same reasoning applies to the trial court's refusal to permit the *voir dire* question in the present case.[6] And this view is not changed by the fact that the Commonwealth's Attorney was permitted to ask the jurors if they knew a death verdict must be unanimous.

### 2. Challenge for Cause

Pruett contends the trial court abused its discretion in the jury-selection process and "failed to properly preserve [his] right to an impartial jury at the penalty phase." Initially, the trial court questioned the jurors as a group and then examined each one separately. Prospective juror Alfred Friedman survived the group questioning and the individual examination by the court and the Commonwealth's Attorney. When Friedman was questioned individually by defense counsel, however, the following occurred:

[Defense counsel]: Now, if the evidence showed that this victim was helpless, that the murder was especially brutal, that she suffered before her death, that her hands were tied and her mouth was gagged, do you feel you could still consider giving David Pruett life in the penitentiary knowing what I have just told you?

---

[6] In the penalty phase of the case, Pruett tendered Instruction 2A. He admits 2A was "virtually identical to" the instruction condemned in *Justus*. Pruett's tendered Instruction 2B would have told the jury the same thing in different language. Both were properly refused.

Mr. Friedman: Could I consider it? Yes. I could consider it.

[Defense counsel]: Okay, sir. And if you also learned at the sentencing stage that Mr. Pruett had done this before some ten years prior to another helpless victim, do you still feel you could consider giving him life in the penitentiary as opposed to the death penalty? Second murder now. You are sentencing him on the second.

Mr. Friedman: I would have to struggle at that point.

[Defense counsel]: Okay, sir. Let me take you one further question. Given the fact that evidence has been presented that he's killed two helpless women, bound, with a knife and that they have both suffered and that he put on no evidence in mitigation of these offenses, could you consider life in the penitentiary as opposed to death?

Mr. Friedman: That's a tough question.

[Defense counsel]: These are tough cases.

Mr. Friedman: Yes. I know that. I could consider life, but I would probably lean toward the death penalty.

Arguing that Friedman's answers showed he was "predisposed towards the death penalty and could not give a fair consideration to life imprisonment," Pruett moved the trial court to strike Friedman for cause. The trial court denied the motion, and Pruett used a peremptory strike to remove Friedman from the panel.

Pruett argues on appeal that Friedman's answers on *voir dire* "clearly indicate that his state of mind was not impartial as to the possible punishment for [capital murder]." Citing *Justus*, Pruett maintains that Friedman exhibited the sort of partiality that "no amount of rehabilitation" could erase. 220 Va. at 977, 266 S.E.2d at 91.

In *Justus*, however, the prospective juror had formed an opinion of the defendant's guilt so strong that "if no evidence was forthcoming from him, [her] opinion would persist." *Id.* In the present case, Friedman did not display such an inflexible attitude. In the same breath that he said he "would probably lean toward the death penalty," Friedman also said he "could consider life [imprisonment]." Even after he said he leaned toward the death penalty, Friedman responded to further questioning by defense coun-

sel and affirmed that "[i]f [his] conscience dictated it, . . . [he] could hold" to the conviction that "life would be a proper punishment . . . even if all eleven of [his] fellow jurors were voting for the death penalty."

In deciding whether the trial court erred in refusing to strike Friedman for cause, we do not confine our consideration to the bald statement that he "would probably lean toward the death penalty." We consider that the statement was made against the backdrop of the worst possible scenario under circumstances which likely would prompt a similar statement from other prospective jurors. We also consider the statements Friedman made before and after his "leaning toward" answer, statements showing clearly that his views on capital punishment would not "prevent or substantially impair the performance of [his] duties as [a juror] in accordance with instructions of the court and [his] oath." *Clozza v. Commonwealth*, 228 Va. 124, 128, 321 S.E.2d 273, 276 (1984), *cert. denied*, 465 U.S. 1230 (1985) (prospective jurors indicated belief that death was appropriate punishment for capital murder); *see also Boggs* v. *Commonwealth*, 229 Va. at 516, 331 S.E.2d at 418.

## II. The Guilt Phase

Pruett's only complaint about the guilt phase of his trial concerns a comment made by the Commonwealth's Attorney during his closing argument to the jury. The prosecutor stated that "[t]he defense conceded [guilt] in their voir dire of you and in their opening statement." Citing the portion of the comment concerning the concession during *voir dire*, Pruett moved for a mistrial. The trial court denied the motion.

Pruett argues that the prosecutor's comment improperly "insinuated to the jury panel that counsel for the defense had talked with each of them at voir dire about [Pruett] committing these crimes [when in fact] not all prospective jurors were asked questions . . . in which [Pruett's] guilt was indicated." Defense counsel says he indicated that "[Pruett] may have committed the crimes . . . in order to ascertain any possible bias at the penalty stage." Counsel states, however, that he chose "on an individual case-by-case basis" which of the prospective jurors would be asked questions indicating guilt and that the prosecutor's comment effectively nullified this choice.

■ The trial court did not err in denying Pruett's motion for mistrial. Defense counsel did concede guilt to some of the prospective jurors during individual *voir dire* examination and, in his opening statement, counsel told the jury:

The defense will not contest any facts presented by the Commonwealth. . . . Defense will not put on any evidence on the issue of guilt or innocence. . . . I guess hearing that, at least, you know the direction we are eventually going in.

So you think here's the man's attorney telling you that the Commonwealth's evidence is correct, and he has no evidence to offer . . . [but he is] the same attorney . . . who . . . got a commitment from you [during *voir dire*] that each and every one of you can give consideration, serious consideration in your deliberations as to two forms of punishment.

In closing argument to the jury, defense counsel noted that the Commonwealth's Attorney in his argument "referred several times to the fact that [the defense] had conceded guilt in this matter." Counsel then said he could not "take issue with [the prosecutor] on that point." Counsel also told the jury that his "goal [was] to save David Pruett's life" and that he had " 'just begun to fight' . . . for about the highest stakes . . . any lawyer could ever fight for."

It is obvious that, in view of the well-nigh-conclusive nature of the evidence of Pruett's guilt, the defense adopted the tactic of conceding culpability in the early stages of the trial in aid of a later effort in the penalty phase to save Pruett from the electric chair. Defense counsel admits that he conceded guilt to some of the prospective jurors during *voir dire* and, although he did not use precise language of concession, he effectively conceded guilt to all the actual jurors in his opening statement.

It is difficult to understand, therefore, why Pruett objects to the prosecutor's comment that he had conceded guilt to all the prospective jurors or how the comment prejudiced him. The comments certainly did not prevent the defense tactic from succeeding, and the fact that the tactic did not succeed does not convert the comment into reversible error.

## III. The Penalty Phase

### A. Admission of Prior Unadjudicated Criminal Conduct

In the penalty phase of the trial, the jury received evidence of Pruett's prior convictions for attempted robbery and embezzlement. The jury also viewed the videotape of the interview conducted on the afternoon of February 14, 1985, during which Pruett confessed not only to the murder of Wilma Harvey but also to the 1975 killing of Debra McInnis. In addition, the jury heard, over Pruett's objection, the testimony of Larry McInnis, Debra's husband.

McInnis testified that on the evening of May 25, 1975, he went to meet his wife "after work" at the Kentucky Fried Chicken store where she was employed. Finding the front door locked, he went to the side door and heard "some distressing noises." He opened the door, entered the store, and found his wife "laying in the floor in a pool of blood." She had "multiple stab wounds about her throat, along with slash marks on her throat," and "a large lump on the side of her head." She was alive, but she died the next day.

Pruett acknowledges that this Court "has consistently allowed evidence of a defendant's . . . prior unadjudicated criminal conduct . . . to come in at the sentencing stage in a capital case in order to prove his future dangerousness as a continuing threat to society." Pruett contends, however, that by allowing Larry McInnis to testify, the trial court permitted the Commonwealth to introduce evidence of the vileness of the 1975 murder of Debra McInnis, evidence which was irrelevant to the question whether Pruett represented a continuing threat to society.

Furthermore, Pruett maintains, the Commonwealth was permitted to play for the jury "an extremely lengthy and detailed videotaped confession out of [his] very mouth as to the circumstances of his killing of Debra McInnis in 1975." The testimony of Larry McInnis "served merely to inflame the jury," Pruett opines, and, hence, the trial court should have limited the evidence of his prior unadjudicated criminal conduct to his videotaped confession.

Under Code §§ 19.2-264.2 and -264.4(C), the death penalty may be imposed only if the Commonwealth proves the future dangerousness of the accused or the vileness of the offense for

which he is on trial.[7] Future dangerousness may be established by showing that there is "a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit *criminal acts of violence* that would constitute a continuing serious threat to society." Code § 19.2-264.4(C) (emphasis added).

In *Smith* v. *Commonwealth*, we defined "criminal acts of violence" as "serious crimes against the person committed by intentional acts of unprovoked violence." 219 Va. at 478, 248 S.E.2d at 149. The testimony of Larry McInnis concerning the condition in which he found his wife tended to fit her murder precisely within the *Smith* definition. The same testimony no doubt also tended to establish the vileness of the McInnis murder, and, if offered solely for that purpose, the testimony may have been irrelevant and thus inadmissible. But evidence of a prior act of violence is certainly probative of the probability that the accused would commit other criminal acts of violence. When offered for that purpose, as the testimony of McInnis was offered here, the evidence should be considered relevant and admissible.

Furthermore, we do not think the trial court was bound to limit the evidence of prior unadjudicated conduct to what was revealed by the videotape. In the first place, Pruett's confession as it related to the McInnis murder was not as detailed as Pruett now maintains. On many matters about which he was questioned, Pruett answered either that he did not know or could not remember. On one vital point concerning the number of times he stabbed Mrs. McInnis, Pruett first said he stabbed her numerous times but later reversed himself and said a few times. And even when the interview neared its end, Pruett's interrogators were still trying to get him to provide details they apparently thought necessary to confirm that it was he who actually murdered Mrs. McInnis.

Aside from that, Larry McInnis was the first person to observe the victim and the crime scene after the fatal attack. Regardless of the relationship he shared with the victim, he was a competent witness with first-hand knowledge of essential facts. His testimony was not offered "merely to inflame the jury," but to supplement and corroborate Pruett's confession.

---

[7] Pruett concedes that the jury found against him "on both the issues of future dangerousness and vileness of the offense."

We have approved the admission of similar evidence of prior unadjudicated criminal conduct in the penalty phase in a number of death penalty cases, including our recent decisions in *Poyner* v. *Commonwealth*, 229 Va. at 418, 329 S.E.2d at 827-28, *Watkins* v. *Commonwealth*, 229 Va. at 488, 331 S.E.2d at 436, and *Frye* v. *Commonwealth*, 231 Va. 370, 393, 345 S.E.2d 267, 283 (1986). While the factual situations involved here and in our earlier decisions may vary somewhat from case to case, the basis for the legal principle remains the same: evidence of prior criminal acts of violence, whether adjudicated or not, is relevant to a determination of future dangerousness. Accordingly, we adhere to our earlier rulings and hold that the trial court did not err in admitting the testimony of Larry McInnis.

### B. Propriety of Death Sentence

#### 1. Passion and Prejudice

Code § 17-110.1(C)(1) requires this Court in every capital case to determine whether the death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor." Pruett argues that the trial court erred in upholding the death penalty in this case because it was the product of passion and prejudice. The record, however, is free from any indication that the jury was motivated by untoward influences in deciding to fix Pruett's punishment at death. So we reject Pruett's argument.

#### 2. Excessiveness and Disproportionality

Code § 17-110.1(C)(2) requires this Court to decide whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Pruett argues that his death sentence is excessive and disproportionate to the penalty imposed in similar cases.

Pruett's argument necessitates a comparison of his case with other capital cases. For this purpose, pursuant to Code § 17-110.1(E), we have accumulated "the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." In making the required comparison, then, we turn to a consideration of "both the crime and the defendant" involved in this case.

### a. The Crime

Taking advantage of his friendship with the Harveys, knowing that Richard Harvey was out of town, and acting on the pretext that he wanted "[t]o see how [Wilma] was doing," Pruett visited the Harvey home on February 12, 1985, and engaged Wilma in conversation. He formed the intent to rob her when a paper boy called to collect and Pruett saw Wilma take money from a cash box. Later, when Wilma said she had "to get ready to go . . . to her church," Pruett asked permission to use the bathroom. While in the bathroom, he decided he "wanted some sex" and told himself, "well, go do it."

Pruett emerged from the bathroom and told Wilma he wanted "some sex." She refused, and he "had to force her" by brandishing a knife he had brought with him. After the rape, he "tied her up" hand and foot, gagged her with a sock, and stabbed her repeatedly. When she tried to kick him, he "cut her whole throat open." He thought "the knife went all the way through."

Pruett then "looked through all the drawers." He took money from the drawers as well as the cash box out of which Wilma paid the paperboy.

An autopsy was performed on Wilma's body, and the medical examiner testified at the sentencing hearing. He stated that Wilma suffered "seven stab wounds located on the neck, and twelve stab wounds located on her chest and one to her abdomen." She had "slash wounds . . . on the neck," one superficial and the other "very deep." There were "three [cut] wounds on her left hand" and "stab wounds . . . that . . . passed through and through—one on the left thigh and one on her left leg." There was a "small superficial stab over her left kneecap" and "a superficial cut over her left great toe." In all, the medical examiner counted 29 wounds to Mrs. Harvey's body. In addition, he found "bruising from blunt force injury to the back of her right thigh."

The medical examiner expressed the opinion that any one of several wounds would have been fatal by itself and that others would have been fatal "in combination." He also said that the gag in Mrs. Harvey's mouth was tied in such a way it alone would have caused death by asphyxia "over a period of time." Further, Wilma's arms were tied so tight with a nylon stocking that ligature marks remained when the stocking was removed.

The medical examiner testified further that Mrs. Harvey suffered "defensive wounds" to her left arm and leg, meaning

wounds "produced on the extremities . . . as the victim attempts to ward off the blows of the weapon." Finally, the doctor stated that all the wounds were inflicted prior to death, while Wilma was "in a lying-down position," and "after her hands were tied."

Under Code § 19.2-264.2, the crime of capital murder is subject to the death penalty if it is "outrageously or wantonly vile, horrible or inhuman in that it involve[s] torture, depravity of mind or an aggravated battery to the victim." This is the "vileness" factor referred to in our death penalty opinions. The foregoing description of Pruett's crime depicts the torture inflicted upon the victim, the aggravated battery committed against her, and the depravity of mind of her assailant, all attesting the utter vileness of the offense.

### b. The Defendant

As noted in Part III (A), *supra*, a person who commits capital murder is subject to the death penalty if it is proved that there is "a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.4(C). This is the "dangerousness" factor, as we have called it in our opinions.

We have recited in other parts of this opinion the history of Pruett's previous criminal convictions, the evidence of his prior unadjudicated criminal conduct in the killing of Debra McInnis, and the circumstances surrounding his rape, robbery, and murder of Wilma Harvey. This recitation establishes the strong probability that Pruett would commit other criminal acts of violence that would constitute a continuing serious threat to society, thus attesting his extreme dangerousness.

### 3. The Comparison

In determining whether a sentence of death is excessive or disproportionate, we inquire if "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980); *see also Boggs* v. *Commonwealth*, 229 Va. at 523, 331 S.E.2d at 422. Considering both the crime and the defendant involved in this case, we can say

without qualification that Pruett's offense is the sort for which juries in Virginia generally have approved the death penalty. Indeed, Pruett's case ranks among the worst we have considered since Virginia's present death penalty statutes became effective in 1977.

 Before concluding, we note a request by Pruett that we commute his sentence of death to life imprisonment. Although Code § 17-110.1(D) authorizes such action, we are unable to find any reason to commute Pruett's sentence or otherwise to disturb the judgment of the trial court. Accordingly, the judgment will be affirmed.

*Affirmed.*