PRESENT: Carrico, C.J., Compton, Hassell, Keenan, Koontz, and
Kinser, JJ., and Stephenson, Senior Justice

ERIC CHRISTOPHER PAYNE

v.  Record No. 980559

COMMONWEALTH OF VIRGINIA

             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                        Thomas N. Nance, Judge

                              OPINION BY
                 SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.
                           January 8, 1999

ERIC CHRISTOPHER PAYNE

v. Record No. 980879

COMMONWEALTH OF VIRGINIA

             FROM THE CIRCUIT COURT OF HANOVER COUNTY
                      Richard H.C. Taylor, Judge

     Eric Christopher Payne received two death sentences in each
of these appeals.  Although Payne has waived his appeals of
right, former Code § 17-110.1 (now Code § 17.1-313) mandates
that we review the death sentences nonetheless.  In this review,
we consider and determine whether the sentences were imposed
"under the influence of passion, prejudice or any other
arbitrary factor" and whether the sentences are "excessive or
disproportionate to the penalty imposed in similar cases,
considering both the crime and the defendant."  Former Code
§ 17-110.1(C).

                                I

A

Payne was charged with the capital murder of Sally Marie Fazio in the commission of robbery, in violation of Code § 18.2-31(4), and with the capital murder of Fazio in the commission of rape, in violation of Code § 18.2-31(5) (the Fazio case). In the first phase of a bifurcated trial, the jury found Payne guilty of both capital murders. At the penalty phase of the trial, after hearing evidence of Payne's prior criminal history, the jury found the "future dangerousness" predicate and the "vileness" predicate to be present and unanimously fixed Payne's punishment at death for each of the two capital murder convictions. Code § 19.2-264.2. After considering a probation officer's report and conducting a sentencing hearing, the trial court sentenced Payne in accord with the jury verdicts.

Payne filed a notice of appeal, but subsequently requested permission to waive his appeal of right. We directed the trial court to conduct an evidentiary hearing to determine whether Payne's decision to waive his appeal was made knowingly, voluntarily, and intelligently. The trial court conducted such a hearing and found that Payne's waiver was made knowingly, voluntarily, and intelligently, and we conclude that the record supports that finding.

B

2

The evidence in the Fazio case is undisputed. On the evening of June 11, 1997, Payne saw Fazio outside her residence in the City of Richmond, caring for her sick dog. When Fazio entered her house, Payne put a 22-ounce hammer in his pants, went to Fazio's front door, and asked to use the telephone. Fazio permitted Payne to use a portable telephone outside her house, and, after feigning a telephone call, Payne returned the telephone. As he handed the telephone to Fazio, Payne forced his way into Fazio's house and struck her in the head with the hammer, knocking her down.

Fazio briefly struggled with Payne and then attempted to flee down a hallway to her bedroom. As she fled, she threw a chair behind her, attempting to block Payne. Fazio tried to close the bedroom door, but Payne forced his way into the room. Fazio pleaded for her life and offered to write a check to Payne.

Payne told Fazio that, if she removed her clothes, he would not hurt her. Fazio removed her clothes, and Payne raped her.[1] During the attack, Payne repeatedly struck Fazio with the hammer.

Thereafter, Payne took money from Fazio's pocketbook and ransacked her house looking for more money and guns. He then

---

[1] Payne admitted penetrating Fazio's vagina and ejaculating on her.

removed his bloodstained clothing and dressed in sweatpants and a T-shirt belonging to Fazio. He left the bloodstained clothing in Fazio's house.

As Payne was preparing to leave the house, he noticed that Fazio was still breathing, so he hit her with the hammer several times in the head. Fazio continued breathing, so Payne "hit her maybe ten, twelve times in the chest."

Payne wrapped the hammer in a towel and subsequently threw the hammer out of his car window. Later that night, Payne disposed of the clothing he had taken from Fazio's home in a dumpster at a public high school.

The police recovered the hammer, and forensic evidence established that the hammer contained traces of blood consistent with Fazio's blood type. Semen stains from a bedspread and clothing found at the crime scene were consistent with Payne's blood type and DNA profile.

The medical examiner's autopsy revealed that Fazio had died from blunt force trauma to the head, the result of multiple blows that had caused fractures, contusions, hemorrhaging, and edema. Fazio also had sustained multiple bone fractures and contusions to her chest and a fractured right middle finger.

In the penalty phase of the trial, the Commonwealth presented evidence of Payne's prior criminal history. This

included the attempted rape and murder of Ruth Parham on June 5, 1997. The Commonwealth also presented evidence of an assault by Payne on Ridley Fleck and her eight-year-old son, W. Dean Fleck. This attack also occurred on June 11, 1997, shortly before Payne murdered Fazio. Payne attacked the Flecks with a hammer, and he told the police that he attacked them because he wanted to incapacitate Ms. Fleck and take her elsewhere to rape her. Payne, however, was forced to leave the scene because Dean Fleck was screaming and fighting. The Flecks both suffered skull fractures in the attack.

C

1

We first consider whether the death sentences in the Fazio case were imposed "under the influence of passion, prejudice or any other arbitrary factor." Former Code § 17-110.1(C)(1). Payne contends that a videotape of the crime scene and autopsy and crime scene photographs, presented during the guilt phase of the trial, were unduly graphic and were shown to inflame the passions of the jury. He further contends that a crime scene videotape related to his earlier attempted rape and murder of Ruth Parham, presented during the penalty phase of the trial, also was unduly graphic.

We consistently have held that the admission of photographs into evidence rests within the sound discretion of a trial

5

court, and the court's decision will not be disturbed on appeal unless the record discloses a clear abuse of discretion. Walton v. Commonwealth, 256 Va. 85, 91-92, 501 S.E.2d 134, 138 (1998); Goins v. Commonwealth, 251 Va. 442, 459, 470 S.E.2d 114, 126, cert. denied, 519 U.S. 887 (1996); Washington v. Commonwealth, 228 Va. 535, 551, 323 S.E.2d 577, 588 (1984), cert. denied, 471 U.S. 1111 (1985). Photographs of a victim are admissible to prove motive, intent, malice, premeditation, method, and the degree of atrociousness of the crime. Walton, 256 Va. at 92, 501 S.E.2d at 138; Goins, 251 Va. at 459, 470 S.E.2d at 126. Photographs that accurately portray the crime scene are not rendered inadmissible simply because they are gruesome or shocking. Walton, 256 Va. at 92, 501 S.E.2d at 138; Gray v. Commonwealth, 233 Va. 313, 343, 356 S.E.2d 157, 173, cert. denied, 484 U.S. 873 (1987); Washington, 228 Va. at 551, 323 S.E.2d at 588. Likewise, videotapes that accurately depict a crime scene are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime, even if photographs of the crime scene also have been admitted into evidence. Stewart v. Commonwealth, 245 Va. 222, 235, 427 S.E.2d 394, 403, cert. denied, 510 U.S. 848 (1993).

We have examined the videotapes of the Fazio crime scene and the Parham crime scene, the photographs of the Fazio crime scene, and the Fazio autopsy photographs. While the photographs

6

and videotapes are shocking and gruesome, they accurately depict the crime scenes and the conditions of the victims and are relevant to show motive, intent, method, malice, premeditation, and the atrociousness of the crimes. They also are relevant to show the likelihood of Payne's future dangerousness. Therefore, we cannot say that the trial court abused its discretion in admitting this evidence, and we reject Payne's contention that the evidence was so graphic as to unduly influence the emotions of the jury.

Payne also contends that evidence about Dean Fleck's injuries and the Commonwealth's Attorney's references to the child's bravery in identifying Payne and, thereby, assisting in Payne's capture were intended to inflame the passions of the jury. This evidence was presented in the penalty phase of the trial and was relevant to show Payne's future dangerousness. Furthermore, the Commonwealth's Attorney's remarks were accurate and based upon the evidence.

Upon our review of the entire record in the Fazio case, having considered the contentions advanced by Payne, we conclude that the death sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

2

We next consider whether the death sentences in the Fazio case are "excessive or disproportionate to the penalty imposed

7

in similar cases, considering both the crime and the defendant." Former Code § 17-110.1(C)(2). Pursuant to former Code § 17-110.1(E), we have accumulated and reviewed the records in all capital murder cases decided by this Court, including both cases in which the death sentence was imposed and cases in which life imprisonment was imposed. From these cases, we determine whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." Stamper v. Commonwealth, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980). In making this review, we have given particular attention to those cases in which the death sentence was based upon both the "vileness" and the "future dangerousness" predicates. From this review, we conclude that Payne's sentences were neither excessive nor disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth for similar or comparable crimes. See, e.g., Barnabei v. Commonwealth, 252 Va. 161, 179-80, 477 S.E.2d 270, 281 (1996), cert. denied, 520 U.S. 1224 (1997); Breard v. Commonwealth, 248 Va. 68, 89, 445 S.E.2d 670, 682, cert. denied, 513 U.S. 971 (1994); Satcher v. Commonwealth, 244 Va. 220, 261, 421 S.E.2d 821, 845-46 (1992), cert. denied, 507 U.S. 933 (1993); Spencer v. Commonwealth, 238 Va. 295, 318-20, 384 S.E.2d 785, 799-800 (1989), cert. denied, 493 U.S. 1093 (1990).

8

## II

### The Parham Case

#### A

Payne pleaded guilty to the capital murder of Ruth Parham while in the commission of or subsequent to object sexual penetration and to the capital murder of Parham while in the commission of or subsequent to attempted rape, both in violation of Code § 18.2-31(5) (the Parham case). The trial court accepted Payne's voluntary pleas and found him guilty of both capital murders.

In a separate sentencing proceeding, the court found that the evidence established beyond a reasonable doubt both aggravating factors; i.e., "vileness" and "future dangerousness." The court imposed the death penalty for each offense.

Payne filed a motion to waive his appeal of right, and we remanded the case to the trial court for a determination whether the waiver was made knowingly, voluntarily, and intelligently. Payne was examined, at his request, by a psychologist and was found to be competent to waive his appeal. Thereafter, the trial court conducted a hearing and determined that Payne's waiver was made knowingly, voluntarily, and intelligently, and we conclude that the record supports that determination.

Although Payne waived his appeal of right, we must review the death sentences nonetheless. Former Code § 17-110.1 (now Code § 17.1-313). As previously noted, this mandatory review directs this Court to consider and determine whether the sentences were "imposed under the influence of passion, prejudice or any other arbitrary factor" and whether the sentences are "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Former Code § 17-110.1(C).

B

The evidence in the Parham case is undisputed. On June 5, 1997, Payne saw Parham enter an office building in Hanover County. Payne concealed a large hammer inside his pants and entered the building. He found Parham, a 61-year-old woman who cleaned the offices, in a lunchroom. Payne asked Parham if he could use the telephone, and she consented.

Parham had turned her back on Payne and had taken about three steps when Payne hit her in the back of her head with the hammer. Parham fell facedown, and Payne began to rip off her clothes. Payne fondled Parham's breast and inserted his finger into her vagina. During the attack, Payne repeatedly struck Parham's head with the hammer.

Parham sustained four depressed skull fractures, each of which was potentially fatal, and she also sustained a fractured

nose and numerous facial and skull bruises and lacerations. Parham's left hand had on it traces of her blood and strands of her hair, indicating that she was alive during the bludgeoning, and her brain was extruding through one of her skull fractures.

After the murder, Payne removed his shirt and used it to wipe doorknobs and other items he may have touched in the room. He then went throughout the building looking for another female victim before leaving. Payne had decided not to rape Parham because "she did not appeal to him."

In the sentencing proceeding, the trial court received evidence about Payne's prior criminal history. Less than five months before Payne murdered Parham, he had been released on parole after serving approximately five years in prison for drug possession. Payne told the police that, during the entire time he had been in prison, he had thought about raping and killing a woman. The trial court heard about Payne's attack upon Fleck and her young son and Payne's murder of Fazio, details of which are more fully set forth in Part I, B hereof.

C

We first consider and determine whether the death sentences in the Parham case were imposed "under the influence of passion, prejudice or any other arbitrary factor." Former Code § 17-110.1(C)(1). Payne contends that the Commonwealth's Attorney made improper remarks in the sentencing proceeding. Payne

11

complains that the prosecutor used the evidence of the Fazio and Fleck crimes to justify the death penalty. He specifically complains about the prosecutor's referring to Payne as a "predator" and a "monster" and showing photographs of the victims to the court during the argument. Payne asserts that the prosecutor's argument "had the desired effect on the court" because the court "described [him] as a mad dog who should be put in a gunny sack with some bricks and dropped off a bridge." Payne opines that this language by the court "is ample evidence that the sentence of death was imposed under the influence of passion and prejudice." We do not agree. When all of the trial court's remarks are read, it is apparent that, before imposing the death sentences, the court considered not only Payne's criminal history, but also his evidence in mitigation.

With respect to the prosecutor's argument, we conclude that it constituted fair comment upon properly admitted evidence. The Commonwealth had the burden of proving beyond a reasonable doubt that "there is a probability based upon evidence of the prior history of the defendant . . . that he would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.4(C) (emphasis added). Therefore, evidence of Payne's other crimes was admissible. See Gray v. Commonwealth, 233 Va. 313, 346-47, 356 S.E.2d 157, 175-76, cert. denied, 484 U.S. 873 (1987); Pruett v.

12

Commonwealth, 232 Va. 266, 283-85, 351 S.E.2d 1, 11-12 (1986), cert. denied, 482 U.S. 931 (1987).

Having considered the entire record, we determine that the death sentences imposed upon Payne were not the product of passion, prejudice, or any other arbitrary factor.

D

Payne makes no argument that his death sentences are excessive or disproportionate. He assumes that we will consider all capital murder cases reviewed by this Court, and we have done so. Suffice it to say, the evidence, including that of the crimes themselves and Payne's criminal history, is gruesome and shocking, and, when this case is compared to other attempted rape and/or robbery capital murder cases, we conclude that the sentences were neither excessive nor disproportionate. See, e.g., Walton v. Commonwealth, 256 Va. 85, 96, 501 S.E.2d 134, 140-41 (1998); Jackson v. Commonwealth, 255 Va. 625, 499 S.E.2d 538 (1998); Breard v. Commonwealth, 248 Va. 68, 89, 445 S.E.2d 670, 682, cert. denied, 513 U.S. 971 (1994); Satcher v. Commonwealth, 244 Va. 220, 261, 421 S.E.2d 821, 845-46 (1992), cert. denied, 507 U.S. 933 (1993).

III

The final issue we consider is common to both the Fazio and the Parham cases; that is, whether there can be more than one

death sentence imposed when there is only one victim.[2]  Stated another way, we must determine whether the imposition of multiple death sentences violates the provision of the Fifth Amendment of the Federal Constitution which states that no person "shall . . . for the same offense . . . be twice put in jeopardy of life or limb."  This constitutional provision guarantees protection against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.  Illinois v. Vitale, 447 U.S. 410, 415 (1980); North Carolina v. Pearce, 395 U.S. 711, 717 (1969); Blythe v. Commonwealth, 222 Va. 722, 725, 284 S.E.2d 796, 797 (1981).

When multiple convictions occur in a single trial, only the third guarantee; i.e., against multiple punishments for the same offense, is pertinent to a double jeopardy inquiry.  Blythe, 222 Va. at 725, 284 S.E.2d at 797-98; Turner v. Commonwealth, 221 Va. 513, 529, 273 S.E.2d 36, 46-47 (1980), cert. denied, 451 U.S. 1011 (1981).  In the single-trial setting, "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense."  Brown v. Ohio, 432

---

[2] Although Payne did not pursue this issue at trial and has waived his appeal of right in these cases, we directed counsel to address the issue.

14

U.S. 161, 165 (1977).  Thus, resolution of the question whether punishments imposed by a court are unconstitutionally multiple requires a determination of what punishments the legislature has authorized.  Whalen v. United States, 445 U.S. 684, 688 (1980).

In determining what punishments the General Assembly has authorized, we first look to the capital murder statute, Code § 18.2-31.  That statute provides, in pertinent part, as follows:

> The following offenses shall constitute capital murder, punishable as a Class 1 felony:
>
> . . . .
>
> 4. The willful, deliberate, and premeditated killing of any person in the commission of robbery or attempted robbery;
>
> 5. The willful, deliberate, and premeditated killing of any person in the commission of, or subsequent to, rape or attempted rape, . . . or object sexual penetration.

(Emphasis added.)  Clearly, the language in Code § 18.2-31 expresses the legislative intent that there are multiple capital offenses.

Next, we look to the rule laid down in Blockburger v. United States, 284 U.S. 299 (1932).  In Blockburger, the Supreme Court stated that, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two

15

offenses or only one, is whether each provision requires proof of a fact which the other does not."  Id. at 304.

In the Fazio case, Payne, "in the same act or transaction," violated "two distinct statutory provisions;" i.e., the killing of Fazio in the commission of robbery, in violation of Code § 18.2-31(4), and the killing of Fazio in the commission of rape, in violation of Code § 18.2-31(5).  Each statutory provision required proof of a fact that the other did not.  Therefore, the killing of Fazio constituted two capital offenses.

Likewise, in the Parham case, Payne, "in the same act or transaction," violated "two distinct statutory provisions" of subsection 5 of Code § 18.2-31; i.e., the killing of Parham in the commission of attempted rape and the killing of Parham in the commission of object sexual penetration.  Again, each statutory provision required proof of a fact that the other did not.  Therefore, the killing of Parham constituted two capital offenses.

Payne does not challenge the validity of his multiple convictions.  However, he suggests that one of his sentences in each case should be vacated.  We do not agree.

We think it is clear, as well as logical, that the General Assembly intended for each statutory offense to be punished

16

separately "as a Class 1 felony."[3]  It would be inappropriate for this Court, or the trial court upon remand, to arbitrarily choose which one of the two sentences should be vacated. Indeed, there would be no principled basis for making such a choice.  Nor do we think the Commonwealth should be required to elect at trial or on appeal which offense to have dismissed.

We hold, therefore, that each conviction was for the violation of a distinct statutory provision for which a separate statutory punishment was authorized.  Consequently, the convictions and sentences do not violate the constitutional guarantee of protection against multiple punishments for the same offense.

IV

In sum, we determine that the death sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor and are not excessive or disproportionate.  We further determine that the convictions and sentences do not violate the constitutional guarantee against double jeopardy. Accordingly, we will affirm the judgments in both cases.

Record No. 980559 — <u>Affirmed</u>.
Record No. 980879 — <u>Affirmed</u>.

JUSTICE KOONTZ, dissenting in part.

I respectfully dissent.

---

[3] The authorized punishments for conviction of a Class 1 felony

Today, for the first time, a majority of this Court concludes that by enacting Code § 18.2-31, our General Assembly has authorized the imposition of more than one death sentence for the capital murder of one victim. Indeed in the present cases, the majority concludes that Eric Christopher Payne is properly subject to the imposition of four death sentences for the capital murder of only two victims. I cannot join in such a patently strange result. Moreover, in my view, such a result was not intended and, consequently, was not authorized by our General Assembly in enacting Code § 18.2-31.

It is clear to me from our prior cases in which this issue was implicated that we have not permitted more death sentences to be imposed than there were victims. See Clagett v. Commonwealth, 252 Va. 79, 472 S.E.2d 263 (1996), cert. denied, 519 U.S. 1122 (1997)(vacating one sentence where five death sentences were imposed for murder of four victims); Williams v. Commonwealth, 248 Va. 528, 450 S.E.2d 365 (1994), cert. denied, 515 U.S. 1161 (1995)(affirming five convictions of capital murder of two victims, but only one death sentence imposed for each victim); Wright v. Commonwealth, 245 Va. 177, 427 S.E.2d 379 (1993), remanded on other grounds, 512 U.S. 1217, aff'd., 248 Va. 485, 450 S.E.2d 361 (1994), cert. denied, 514 U.S. 1085 (1995)(defendant convicted of two counts of capital murder of

_____

include death and life imprisonment. Code § 18.2-10(a).

18

one victim, but sentenced to one death penalty for both convictions); Buchanan v. Commonwealth, 238 Va. 389, 384 S.E.2d 757 (1989), cert. denied, 493 U.S. 1063 (1990)(reducing five death sentences to four where there were only four victims).

The majority correctly notes that the constitutional guarantee against multiple punishments for the same offense provided by the Fifth Amendment of the Federal Constitution is limited to assuring in a single trial setting that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.

I agree with the majority that the resolution of that issue in the present cases requires a determination of the legislative intent underlying Code § 18.2-31.  I do not agree, however, that the language of that statute evinces the General Assembly's intention that multiple punishments may be imposed for the killing of one person where more than one definition, or "offenses," of capital murder is found to apply.  See Gray v. State, 463 P.2d 897, 911 (Alaska 1970).

It is self-evident that there can be no more than one killing of the same person.  Accordingly, it necessarily follows that the killing of one person in the commission of the robbery and rape of that person is still but one killing.  Similarly, the killing of one person in the commission of the rape and object sexual penetration of that person is still but one

19

killing.  I have no difficulty in concluding the General Assembly has always been well aware of these simplistic truths. For that reason alone, I conclude that by enacting Code § 18.2-31, the General Assembly did not intend to authorize more death sentences than there are victims killed as a result of a defendant committing more than one of the enumerated "offenses" that "constitute capital murder."  In short, more than one offense defined in Code § 18.2-31 may constitute the capital murder of a person but there can only be one capital murder penalty for the murder of that person.

The real difficulty presented in these appeals is the appropriate remedy where two death sentences have been imposed for the capital murder of each victim.  I agree with the majority that we should not "arbitrarily choose which one of the two sentences should be vacated" in each case and that "the Commonwealth should [not] be required to elect" which offense to have dismissed.  Rather, I would apply the rationale of Wright and Williams and modify Payne's sentences to impose a single death sentence upon the capital murder convictions for each victim.  In doing so, the patently strange and illogical result that would allow Payne to be sentenced to the penalty of four death sentences for killing two persons would be avoided.