**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DAVID LEE FISHER,
Petitioner-Appellant,

v.

No. 98-4

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-95-955-R)

Argued: October 26, 1998

Decided: December 9, 1998

Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Dismissed by published opinion. Judge Williams wrote the opinion,
in which Judge Widener and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Michele Jill Brace, VIRGINIA CAPITAL REPRESEN-
TATION RESOURCE CENTER, Richmond, Virginia; Richard Barry
Benenson, ARNOLD & PORTER, Washington, D.C., for Appellant.
Robert H. Anderson, III, Assistant Attorney General, OFFICE OF
THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.
**ON BRIEF:** Steven G. Reade, David A. Ashmore, Kristen L. Gustaf-

son, ARNOLD & PORTER, Washington, D.C., for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTOR-NEY GENERAL, Richmond, Virginia, for Appellee.

_____

## OPINION

WILLIAMS, Circuit Judge:

On July 15, 1987, a Virginia jury convicted David Lee Fisher[1] of the capital murder of David Wilkey.[2] Following the jury's determination that Fisher presented a future danger to society, the trial court sentenced Fisher to death. After exhausting all available state remedies, Fisher petitioned the United States District Court for the Western District of Virginia for habeas corpus relief. See 28 U.S.C.A. § 2254 (West 1994).[3] The district court denied his petition and Fisher

_____

[1] During the 1960s and the 1970s, Fisher, then known by a different name, was a member of an organized crime family. After his arrest for receiving stolen property, Fisher became a witness for the United States Department of Justice in its prosecution of a major organized crime figure. As a result of his cooperation, Fisher was allowed to participate in the federal Witness Protection Program, where he was given the name David Lee Fisher and relocated to Charlotte, North Carolina. Fisher's participation in the federal Witness Protection Program is now a matter of public record and, in fact, was noted during his state trial.

[2] Fisher named Ronald J. Angelone, Director of the Virginia Department of Corrections, as Respondent in his petition. For ease of reference we refer to Respondent as "the Commonwealth."

[3] Fisher filed his federal habeas petition on August 20, 1995, prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See Pub. L. No. 104-132, 110 Stat. 1214 (enacted on April 24, 1996). As a result, § 104 of the AEDPA, which amended 28 U.S.C.A. § 2254(d) (West Supp. 1998), does not apply to this appeal. See Lindh v. Murphy, 117 S. Ct. 2059, 2067-68 (1997) (holding that the new habeas standards of review do not apply to habeas petitions pending in federal court prior to the enactment of the AEDPA). As a result, we review Fisher's "claims under pre-AEDPA law." Howard v. Moore, 131 F.3d 399, 403 (4th Cir. 1997) (en banc) (applying pre-AEDPA law to capital habeas petition filed prior to enactment of the AEDPA), cert. denied, 119 S. Ct. 108 (1998); see also Smith v. Moore, 137 F.3d 808, 812 n.1 (4th Cir.) (same), cert. denied, 119 S. Ct. 199 (1998).

appeals, raising numerous challenges to the state court proceedings. On appeal, we conclude that none of the claims raised by Fisher provide a basis for habeas relief. Accordingly, we deny his application for a certificate of probable cause and dismiss the appeal.

I.

As recited by the Virginia Supreme Court, the underlying facts are as follows:

> In 1983, Fisher and his victim, David Wilkey, were both residents of Charlotte, North Carolina. Wilkey's parents had separated in Norfolk, Virginia, when Wilkey was three months old and his mother had moved to Florida with him. When Wilkey was 17 years old, he left his mother's home and went to Norfolk on a fruitless search for his father. He finally went to live in Charlotte with a cousin of his father. Wilkey had a ninth-grade education and was 18 years old at the time of his death.
>
> Fisher met Wilkey at a motel in Charlotte in late 1982 and appeared to befriend him. Wilkey moved into Fisher's apartment and occasionally worked for him. Fisher was in the business of transporting bodies for a funeral home and for the coroner. Fisher devised a plan whereby Wilkey would become close to a young woman named Bonnie Jones, Fisher would obtain an insurance policy on her life, and Wilkey would kill Bonnie for a share of the insurance proceeds. Fisher went so far as to buy Wilkey a car and provide him with money to date Bonnie, but Wilkey fell in love with Bonnie and backed out of Fisher's scheme. Wilkey and Bonnie had plans to return to Florida to be married the first week in December 1983.
>
> In the summer of 1983, Fisher, having learned of Wilkey's defection, told Bobby Mulligan, who was, like himself, a frequenter of coffee houses in Charlotte, that he wanted to get his money back from Wilkey. Fisher proposed that if Mulligan would agree to shoot Wilkey while the three were on a hunting trip, and make the killing appear acciden-

3

tal, Fisher would arrange to insure Wilkey's life and would divide the proceeds with Mulligan.

Fisher also approached Gerald Steadham, yet another frequenter of Charlotte coffee houses, with a proposal to push Wilkey off a ledge while on a fishing trip. Steadham accompanied Fisher to an insurance office where Fisher obtained a policy on Wilkey's life. Fisher had no legitimate insurable interest in Wilkey, but nevertheless obtained a policy on Wilkey's life with Kentucky Central Life Insurance Company for $50,000 with a double indemnity clause in case of death by accident. Fisher paid the $89.50 initial premium.

The original application for insurance, submitted in September 1983, was taken by an insurance agent in Charlotte named Kenneth Daren Tietsort. It showed Fisher as owner and beneficiary of the policy. Fisher identified himself as Wilkey's "guardian." Upon receipt of the application at the company's office in Lexington, Kentucky, the company wrote to Tietsort to ascertain whether Fisher was in fact a court-appointed guardian. Tietsort telephoned the company and suggested that the beneficiary be shown as Wilkey's estate until Fisher's status could be verified. The policy was issued in that form on September 27, 1983.

In October, 1983, the company received three additional documents from Tietsort: an "amendment to application" signed by Tietsort and two "requests for change of primary beneficiary," purportedly signed by David Fisher and David Wilkey, respectively. These papers requested that the beneficiary be changed from Wilkey's estate to "David Fisher, personal friend." On October 11, the company refused to approve the change, questioning the genuineness of Wilkey's change-of-beneficiary form. On October 24, however, the company reversed its position and approved the change of beneficiary. The evidence does not reveal what motivated this change of position.

About this time, Fisher told Mulligan that he had experienced some problem getting an insurance policy on

4

Wilkey's life, but that he had persuaded an insurance man to "take care of it" for a promise of one-third of the proceeds. Fisher promised Mulligan $38,000, more than one-third, because Mulligan was to do the actual killing. Fisher's plan was to go to Bedford County, Virginia, near the residence of his ex-wife, on the opening day of deer season in Virginia. Included in the party were to be Wilkey, Fisher, Mulligan, and Jody Ayers, a 16-year old son of Fisher's ex-wife, who was to be brought along to make their visit to Bedford County "look natural." The plan was for Fisher to provide guns for the party and later dispose of the murder weapon and try to have Wilkey's body cremated.

The hunting trip took place in Bedford County on November 21, 1983, as planned. While walking through the woods, Mulligan became reluctant, but Fisher encouraged him to persevere. About 3:30 p.m., while Jody was resting some distance away, Wilkey ran down a hill after a deer. Mulligan followed him, with Fisher close by. Mulligan shot Wilkey in the back with a 12 gauge slug, mortally wounding him. Fisher yelled to Jody to run for help, then, according to a statement Fisher later made to Steadham, Fisher ran up to Wilkey, who was lying face down on the ground, and told him "if I had my .38 I'd blow your . . . head off." According to Mulligan's later testimony, Fisher attempted to insert his hand into the wound in order to stop Wilkey's heart. Steadham also testified that Fisher later admitted this to him.

When Jody returned with Bedford County officers and the rescue squad, Wilkey was dead. Fisher and Mulligan both gave statements to the effect that Mulligan had slipped while running downhill after Wilkey and that his shotgun had discharged accidentally. The Bedford County authorities at the time treated the shooting as a hunting accident. They charged Fisher and Mulligan with misdemeanors, but when these cases were tried in general district court on December 19, both men were fined and permitted to return to North Carolina. The murder weapon was returned to Fisher.

5

Two days later, Fisher filed a claim for the $100,000 accidental death benefit on the insurance policy he held on Wilkey's life. Reluctant to make payment, the company initiated an investigation of the circumstances surrounding Wilkey's death and referred the matter to John Manning, an attorney in Greensboro, North Carolina. In May 1984, Fisher went to the attorney's office and belligerently demanded payment, threatening to sue the company and claim punitive damages. The attorney, who was himself a hunter, noted from the autopsy report that wadding from the fatal shotgun shell had entered the wound and penetrated the heart cavity. This, he thought, was inconsistent with the statements of Fisher and Mulligan, and also inconsistent with a drawing Fisher made in the attorney's office, purporting to show that the shotgun had discharged 10 or more feet away from Wilkey's back.

Confronted with this inconsistency, Fisher became less demanding and showed himself amenable to settlement. He eagerly accepted a check from the attorney for $25,000 in exchange for a release of his claim against the company. Later, he paid $7,000 of this to Mulligan.

Wilkey's mother called Fisher from Florida when she heard of her son's death. Fisher told her that at some time before his death, Wilkey had expressed a desire to be cremated "if anything happened to him." She promised to have her son's remains cremated. Fisher told her that Wilkey had no money to help with funeral expenses and that there was no insurance on him. Wilkey's mother had the body brought to Florida and cremated there. Fisher did not attend the funeral, but on that day or the next, called Wilkey's mother, expressed sorrow, and inquired whether the body had in fact been cremated.

Mulligan remained in Charlotte for a few months after the killing, and then moved to South Carolina. In early 1985, he suffered a "nervous breakdown" and confessed the murder to his parents. He was arrested by agents of the Federal Bureau of Investigation in November 1986 and made a full

confession of all the details of the crime. During the same month, the Bedford County Grand Jury indicted both Mulligan and Fisher for capital murder. Mulligan entered a guilty plea and was awaiting sentencing at the time of Fisher's trial, in which Mulligan testified for the Commonwealth. Both Mulligan and his attorney testified that Mulligan had received no promises in exchange for his testimony.

Gerald Steadham also testified against Fisher. After Fisher described the killing to him, Fisher offered him $5,000 to kill Mulligan. Fisher said that Mulligan was beginning to talk about the killing and was claiming that Fisher owed him more money. After a time, Steadham decided to tell the Charlotte police of Fisher's statements. Fisher apparently had sources of information within the police force and discovered that Steadham had informed against him. He threatened Steadham's life, which caused Steadham to take his story to the F.B.I., but Fisher and Steadham continued to meet and talk. The F.B.I. began an independent investigation of the crime in late 1985 and used Steadham to gather incriminating admissions from Fisher. On five occasions during the ensuing year, Steadham, "wired" by the F.B.I., met with Fisher in various Charlotte coffee houses and engaged him in lengthy conversations during which Fisher occasionally discussed the killing of Wilkey. These conversations were recorded on tape and transcribed. The tapes were played in full as evidence at Fisher's trial.

Fisher v. Commonwealth, 374 S.E.2d 46, 49-50 (Va. 1988) (footnote omitted).

After a jury trial in the Circuit Court of the City of Bedford, Virginia, Fisher was convicted of the capital murder of Wilkey. Based on its finding -- made during the sentencing phase of Fisher's trial -- of future dangerousness, see Va. Code Ann.§ 19.2-264.4(C) (Michie Supp. 1998), the jury recommended that Fisher be sentenced to death. After conducting a post-trial hearing pursuant to Va. Code Ann. § 19.2-264.5 (Michie 1995) (requiring trial judge to determine whether the jury's recommendation "of death is appropriate and

just"), the Bedford Circuit Court followed the jury's recommendation and sentenced Fisher to death. On direct appeal, the Virginia Supreme Court affirmed Fisher's conviction and death sentence. See Fisher, 374 S.E.2d at 55. The United States Supreme Court denied Fisher's petition for a writ of certiorari. See Fisher v. Virginia, 490 U.S. 1028 (1989).

Fisher filed a habeas corpus petition in the Bedford Circuit Court on August 25, 1989. On February 6, 1990, Fisher requested leave to amend his habeas petition and permission to interview the jurors who served on his jury. On May 7, 1990, the Bedford Circuit Court entered an Order that granted Fisher leave to file an amended petition, but denied Fisher permission to interview the jurors from his criminal trial absent a threshold showing of juror misconduct. On June 7, 1990, Fisher requested that the Bedford Circuit Court reconsider its Order of May 7, 1990, and permit him to interview the jurors from his trial.

Fisher filed his amended petition on August 6, 1990. Therein, Fisher alleged, inter alia, that members of the jury had been exposed to documents and recordings not admitted into evidence and out-of-court statements from persons not on the jury (Claim XI). Fisher argued that, as a result, his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated. The Commonwealth moved to dismiss Claim XI as barred by the rule in Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974) (holding that claims that could have been raised on direct appeal, but were not, cannot be raised on state collateral review). On November 3, 1992, more than two years after filing his renewed request to interview the former jurors from his criminal trial, Fisher filed a supplemental memorandum requesting a hearing. On November 13, 1992, the Bedford Circuit Court held a hearing on the matter. After reconsidering its prior ruling, the Bedford Circuit Court decided that Fisher, pursuant to certain limitations, could interview the jurors who served at his trial. On December 21, 1992, the Bedford Circuit Court issued a written order to that effect.

On January 21, 1993, the Bedford Circuit Court held a hearing on the Commonwealth's motion to dismiss the jury interference claim (Claim XI) contained in Fisher's amended petition as Slayton barred. On March 15, 1993, the Circuit Court ruled that, with the exception

8

of Fisher's ineffective assistance of counsel claims, which would be resolved at a final hearing on May 26, 1993, all of the claims raised in the amended petition were barred. Although the March 15 opinion did not explicitly state the grounds for dismissing Claim XI, the jury interference claim, the Bedford Circuit Court stated that the dismissed claims were all dismissed "for [the] reasons stated by the Attorney General at the January 21 hearing and in the [Commonwealth's] Motion to Dismiss." (J.A. at 2319.) Thus, the Bedford Circuit Court dismissed Claim XI pursuant to Slayton.

On May 11, 1993, Fisher filed another motion to amend his habeas petition. With one exception, the proposed amendments were technical in nature and dealt with Fisher's ineffective assistance of counsel claims. The one exception was a new substantive claim alleging juror misconduct (Claim XXXIV). In particular, Fisher alleged that Bertha Thomas, a member of the jury, had been improperly influenced to vote for the death penalty by her husband, who was not a member of the jury. According to Thomas's sworn affidavit, which was the basis for (but not actually filed with) the motion to amend, her husband told her to vote for the death penalty if she "was the lone `hold-out' juror against a sentence of death."[4] (J.A. at 2355.) The Commonwealth opposed the motion to amend in its entirety "on the ground of timeliness." (J.A. at 2420.) In addition, the Commonwealth objected to Claim XXXIV "on the grounds that [it was] conclusory and insufficiently pleaded." (J.A. at 2421.) In particular, the Commonwealth noted that "[o]nly one juror is identified and no affidavit from her is proffered." (J.A. at 2421.)

On May 26, 1993, the Bedford Circuit Court held its scheduled final hearing on Fisher's habeas petition. Although the Bedford Circuit Court had previously ruled "that the sole issue to be addressed at the May hearing shall be [Fisher's claims] of ineffective assistance of counsel," (J.A. at 2319), Fisher raised his motion to add Claim XXXIV at the outset of the hearing. The Commonwealth renewed its objection to the motion to amend on the grounds that "the entire

_____

[4] Thomas's husband also signed an affidavit confirming that "I told her that if she was the only one of them who was against the death penalty in this case, then I thought she should just go along with the rest of them and vote for the death penalty." (J.A. at 2409.)

9

motion [was] untimely." (J.A. at 2437.) However, because the Commonwealth had not been provided with a copy of the Thomas affidavit, which was executed on April 19, 1993, until the night before the hearing, the Commonwealth argued that it was not prepared to address the merits of Claim XXXIV at that time. Accordingly, the Commonwealth asked the Bedford Circuit Court either to take the claim "under advisement" or to deny the claim "in toto because of the untimeliness alone." (J.A. at 2438.)

After hearing both sides on the motion to amend, the Bedford Circuit Court reminded the parties that the only issue to be addressed at the hearing was Fisher's ineffective assistance of counsel claims. The court then granted Fisher leave to amend his habeas petition "with the exception of [Claim XXXIV]." (J.A. at 2442.) As for Claim XXXIV, the Bedford Circuit Court stated that it would "take [it] under advisement." (J.A. at 2442.) The court then turned to the parties' arguments on Fisher's ineffective assistance of counsel claims.

On the third (and final) day of the hearing, counsel for Fisher once again raised Claim XXXIV. In particular, counsel sought to admit the affidavit prepared by Thomas into the record. The Commonwealth objected to the admission of the affidavit on the ground "that [it] was filed untimely." (J.A. at 2699.) The Bedford Circuit Court refused to admit the affidavit, ruling that it (1) represented an effort to impeach the jury verdict, (2) was not relevant to the issue of ineffective assistance of counsel, (3) was untimely, and (4) was unreliable. Shortly thereafter, Fisher's counsel requested that any affidavits offered from former jurors by the Commonwealth also be denied. In response, the Bedford Circuit Court stated that additional affidavits would "be marked `denied' because I've denied the whole issue." (Hearing Transcript (H.T.) Vol. III at 213.) After twice acknowledging that the court had, in fact, denied Fisher's motion to add Claim XXXIV, (H.T. Vol. III at 214 ("[S]ince Your Honor has denied our Motion to Amend with respect to jurors' conduct . . . ."); H.T. Vol. III at 214-15 ("[S]ince this issue has been denied by the Court in terms of our Motion to Amend . . . .")), counsel for Fisher did not raise Claim XXXIV again during the remainder of the hearing.

In its final order of December 17, 1993, the Bedford Circuit Court rejected Fisher's ineffective assistance of counsel claims on the mer-

10

its. The Order further noted that all of Fisher's other claims for relief were dismissed for the reasons stated in the court's opinion of March 15, 1993. In accord with the court's ruling on May 26, 1993, the Order noted that Fisher's motion to amend his petition further "was granted in part." (J.A. at 2824.) The Order did not explain, however, why the motion to amend was denied in part. Of particular importance here, the Order did not state the court's grounds for denying Fisher's motion to add Claim XXXIV.

On appeal to the Virginia Supreme Court, Fisher raised numerous assignments of error. In his fourth assignment of error, Fisher argued that the Bedford Circuit Court erred in dismissing Claim XI, i.e., his first claim of juror interference, as procedurally barred under Slayton. In his ninth assignment of error, Fisher argued that the Bedford Circuit Court erred "in denying his motion to amend the petition to expand his [allegation] of juror misconduct." (J.A. at 2849.) On July 26, 1994, the Virginia Supreme Court refused the fourth assignment of error (Claim XI) on the ground that the claim was procedurally defaulted, and the ninth assignment of error "on the merits." (J.A. at 2886.) The United States Supreme Court again denied Fisher's petition for a writ of certiorari. See Fisher v. Murray, 115 S. Ct. 745 (1995).

On August 20, 1995, Fisher filed a habeas petition pursuant to 28 U.S.C.A. § 2254 in the United States District Court for the Western District of Virginia. Among his numerous claims, Fisher combined the specific allegations of juror interference contained in Claim XI with the specific allegations contained in Claim XXXIV to create one claim of extraneous juror interference. Pursuant to 28 U.S.C.A. § 636 (West 1993 & Supp. 1998), the petition was referred to a magistrate judge. In August of 1997, the magistrate judge issued a 167-page Report and Recommendation in which he recommended that the district court grant Fisher's request for an evidentiary hearing on the claim of extraneous jury interference and deny federal habeas corpus relief as to all other claims.[5] Both parties filed objections to the Report and Recommendation.

_____
[5] The magistrate judge first issued a Report and Recommendation on April 24, 1997. That initial Report and Recommendation based its find-

11

On October 31, 1997, the district court rejected the magistrate judge's recommendation regarding the extraneous jury interference claim. The district court first noted that the Bedford Circuit Court dismissed Claim XI "on the basis of Slayton." (J.A. at 3492.) The district court then observed that Claim XXXIV "also appear[s] to have been dismissed pursuant to Slayton." (J.A. at 3492-93.) As a result, the district court concluded that the entire jury interference claim was procedurally barred. Accordingly, the district court canceled the evidentiary hearing scheduled for November 17, 1997. On January 23, 1998, the district court denied Fisher's petition for federal habeas relief on all other claims.

On appeal, Fisher contends that he is entitled to habeas relief on the following grounds: (1) extraneous juror interference; (2) his trial counsel were ineffective for (a) failing to challenge the admissibility of his taped conversations with a government witness, (b) failing to develop and present evidence to rebut the aggravating factor of future dangerousness, (c) failing to develop and present additional mitigating evidence, (d) opening the door to evidence of his parole eligibility status, and (e) failing to object when the burden was placed on defendant to prove that he should not be sentenced to death; (3) the cumulative effect of his trial counsel's individual errors rendered their assistance ineffective; (4) his court-appointed mental health experts were constitutionally ineffective; and (5) the Virginia Supreme Court failed to review his sentence for proportionality. We address Fisher's arguments in turn.

II.

In his federal habeas petition, Fisher argues that extraneous juror interference tainted the entire jury and denied him a fair and impartial

_____

ings, in part, on the standards enunciated in the AEDPA. Subsequent to the magistrate judge's filing of the Report and Recommendation with the district court, the Supreme Court decided Lindh v. Murphy, 117 S. Ct. 2059 (1997), which held that the new habeas standards of review do not apply to habeas petitions pending in federal court prior to the effective date of the AEDPA. See id. at 2067-68. As a result, the district court remanded the matter to the magistrate judge for review based on pre-AEDPA law.

12

jury in violation of the Sixth Amendment. Although Fisher raised one claim of juror interference in his federal habeas petition, he raised the allegations constituting that claim in state court as two separate claims: Claim XI and Claim XXXIV. Because our review of this claim turns in no small part on the disposition of each allegation in state court, we will address the allegations separately.

A.

In Claim XI, Fisher alleged that the trial "court erred in permitting the jurors to be exposed to inadmissible or unadmitted evidence and testimony." (J.A. at 2106.) Specifically, Fisher claimed (1) that the jury heard several tape recordings that were never offered into evidence; (2) that the jury had contact with a prosecution witness, Captain R.O. Laughlin, who also served as a bailiff during the trial; and (3) that the jury overheard the examination of a prospective witness, FBI Agent Robert Canfield, whose testimony was not permitted into evidence. On state habeas review, however, both the Bedford Circuit Court and the Supreme Court of Virginia held that Fisher failed to raise the allegations in Claim XI on direct appeal. As a result, both courts held that the claim was procedurally defaulted under Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va. 1974) (holding that claims that could have been raised on direct appeal, but were not, cannot be raised on state collateral review).

In his federal habeas petition, Fisher concedes that the allegations contained in Claim XI were barred pursuant to Slayton. Fisher contends, however, that it is simply not possible to raise a juror interference claim in Virginia on direct appeal. As a result, Fisher argues that the state courts' application of Slayton to his Sixth Amendment claim was neither adequate nor independent. In the alternative, Fisher contends that the factual basis for Claim XI was not available at the time of his direct appeal. As a result, Fisher argues that he can demonstrate cause for, and resulting prejudice from, the default. For the reasons that follow, we disagree with both contentions.

It is well established that, absent cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default, a federal habeas court may not review a claim when a state court has declined to consider the claim's merits on the basis of an adequate

13

and independent state procedural rule. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991) (holding that a claim dismissed on a state procedural rule is procedurally barred on federal habeas review); Harris v. Reed, 489 U.S. 255, 262 (1989) (same). A rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985). We have repeatedly recognized that "the procedural default rule set forth in Slayton constitutes an adequate and independent state law ground for decision." Mu'Min v. Pruett, 125 F.3d 192, 196 (4th Cir.), cert. denied, 118 S. Ct. 438 (1997); see also Bennett v. Angelone, 92 F.3d 1336, 1343 (4th Cir.), cert. denied, 117 S. Ct. 503 (1996); Spencer v. Murray, 18 F.3d 229, 232 (4th Cir. 1994). Moreover, Virginia has consistently applied Slayton to claims of juror interference. See Wright v. Angelone , 151 F.3d 151, 157 (4th Cir. 1998) (noting that the Virginia Supreme Court's dismissal of a juror intimidation claim pursuant to Slayton was an adequate state law ground for its decision). After determining that a state court relied on an adequate and independent state-law ground for decision, we "may only inquire into whether cause and prejudice exist to excuse [a state procedural] default, not into whether the state court properly applied its own law," Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995), in applying Slayton.

Therefore, absent cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default, we may not review Fisher's claim of extraneous juror interference because the Virginia Supreme Court declined to consider the claim's merits upon the basis of an adequate and independent state procedural rule. See Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice resulting therefrom, the federal courts can address the issue's merits); Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (stating that where a petitioner has suffered a fundamental miscarriage of justice a decision on the merits is appropriate without regard to a procedural default). Here, Fisher contends that cause and prejudice excuse any procedural default of his claim.**6**

_____

**6** Because Fisher does not argue that he can demonstrate a fundamental miscarriage of justice to excuse the default, we do not consider whether one exists. See Kornahrens v. Evatt, 66 F.3d 1350, 1361-63 (4th Cir. 1995).

Cause excuses the failure to raise a claim during a state proceeding if "the factual or legal basis for [the] claim was not reasonably available." McCleskey v. Zant, 499 U.S. 467, 494 (1991). Fisher contends that he had absolutely no opportunity to develop this claim prior to his direct appeal because he could not have known about the conduct alleged in Claim XI at that time. We disagree. The allegations raised in Claim XI could (and should) have been known at the time of Fisher's trial. In fact, Fisher's assertion that it was not possible for his trial counsel to have known prior to his direct appeal whether the tape recordings played to the jury were ever offered into evidence is simply incredible. Similarly, Fisher's trial counsel could have learned prior to the direct appeal whether a prosecution witness was also working in the courtroom as a bailiff or whether the jury overheard the examination of a prospective witness. In sum, there was ample time for Fisher to develop this claim prior to his filing his direct appeal. As a result, Fisher's failure to raise the claim on direct appeal acts as an independent bar to federal habeas review.

B.

In Claim XXXIV, Fisher alleged that his Sixth Amendment rights were violated when a juror was improperly influenced by a non-juror. Specifically, Fisher alleged that Bertha Thomas, a member of the jury, had been improperly influenced to vote for the death penalty by her husband, who was not a member of the jury. According to Thomas's sworn affidavit, her husband told her to vote for the death penalty if she "was the lone `hold-out' juror against a sentence of death." (J.A. at 2355); cf. Stockton v. Virginia, 852 F.2d 740, 745-46 (4th Cir. 1988) (holding that non-juror's comment that he hoped jurors would "fry the son-of-a-b----" constituted jury interference). For the reasons that follow, we conclude that the allegations raised in Claim XXXIV were dismissed by the Virginia Supreme Court on procedural grounds and that Fisher has failed to demonstrate cause to excuse the default. As a result, Fisher is procedurally barred from raising the same allegations before us on federal habeas review.

Both parties agree that Fisher was denied permission to add Claim XXXIV to his state habeas petition and that the Virginia Supreme Court affirmed the Bedford Circuit Court's refusal to amend the petition with respect to Claim XXXIV "on the merits." Thus, whether the

15

allegations raised in Claim XXXIV are properly before us on federal habeas review ultimately turns on whether the Bedford Circuit Court denied Fisher's motion to add Claim XXXIV on procedural grounds or on the merits. Fisher, not surprisingly, contends that his motion to amend was denied on the merits. Specifically, Fisher contends that the Bedford Circuit Court denied the claim because it believed that Fisher was attempting to impeach the verdict. The Commonwealth, in contrast, argues that Fisher's motion to amend was denied on the procedural ground of timeliness.

Fisher filed his motion to amend his habeas petition on May 11, 1993. Shortly thereafter, the Commonwealth filed an objection to the motion to amend "on the ground of timeliness." (J.A. at 2420.) Two weeks later, during the hearing on Fisher's claims of ineffective assistance of counsel, Fisher asked the Bedford Circuit Court to grant his motion to amend. The Commonwealth renewed its objection to the motion to amend on the grounds that "the entire motion [was] untimely." (J.A. at 2437.) Because the Commonwealth had not been provided with a copy of the Thomas affidavit until the night before the hearing, however, the Commonwealth also argued that it was not prepared to address the merits of Claim XXXIV at that time. Accordingly, the Commonwealth asked the Bedford Circuit Court to either take the claim "under advisement" or deny the claim "in toto because of the untimeliness alone." (J.A. at 2438.)

After hearing both sides on the motion to amend, the Bedford Circuit Court granted Fisher leave to amend his habeas petition "with the exception of [Claim XXXIV]." (J.A. at 2442.) As for Claim XXXIV, the Bedford Circuit Court stated that it would "take [it] under advisement." (J.A. at 2442.) On the final day of the hearing, counsel for Fisher once again raised Claim XXXIV. In particular, counsel sought to admit the affidavit prepared by Thomas into the record. The Commonwealth objected to the admission of the affidavit on the ground "that it was filed untimely." (J.A. at 2699.) The Bedford Circuit Court refused to admit the affidavit, ruling that it (1) represented an effort to impeach the jury verdict, (2) was not relevant to the issue of ineffective assistance of counsel, (3) was untimely, and (4) was unreliable. (J.A. at 2714.) Shortly thereafter, Fisher's counsel requested that any affidavits offered from former jurors by the Commonwealth also be denied. In response, the Bedford Circuit Court stated that the

16

admission of additional affidavits would be denied"because I've denied the whole issue." (H.T. Vol. III at 213.) After that exchange, counsel for Fisher acknowledged, on two separate occasions, that the court had, in fact, just denied Fisher's motion to add Claim XXXIV. (H.T. Vol. III at 214 ("[S]ince Your Honor has denied our Motion to Amend with respect to jurors' conduct . . . ."); H.T. Vol. III at 214-15 ("[S]ince this issue has been denied by the Court in terms of our Motion to Amend . . . .")).

In its final Order of December 17, 1993, the Bedford Circuit Court stated, in accord with its oral ruling at the May hearing, that Fisher's motion to amend his petition further "was granted in part." (J.A. at 2824.) The final Order did not explain, however, why the motion to amend was granted in part and denied in part. Specifically, the final Order did not state the court's grounds for denying Fisher's motion to add Claim XXXIV. The final Order did, however, dismiss Fisher's ineffective assistance of counsel claims on the merits. The final Order also noted that all of Fisher's other claims were dismissed for the reasons stated in the court's opinion of March 15, 1993.

Although the Bedford Circuit Court never explicitly stated the ground for denying Fisher's motion to amend, the record as a whole points to a procedural resolution of the claim. See Coleman, 501 U.S. at 740-44 (looking at the record as a whole to conclude that the state court's judgment rested on procedural grounds). First, the record indicates that the Commonwealth immediately filed an objection to the motion to amend on the ground of timeliness. Then, before the Bedford Circuit Court at the May hearing, the Commonwealth repeatedly objected to the motion to amend on the ground of timeliness. Indeed, the Commonwealth specifically noted at the hearing that it was not prepared to address the merits of the claim and that a denial of the motion to amend at the May hearing would necessarily have to be based on timeliness. It is clear, therefore, that all of the argued grounds for dismissal were procedural. See Hunter v. Aispuro, 958 F.2d 955, 958 (9th Cir. 1992) (looking at the grounds argued in favor of dismissal when interpreting the meaning of a dismissal order).

Second, it is undisputed that the Bedford Circuit Court denied Fisher's motion to amend his habeas petition with respect to Claim XXXIV during the three-day hearing in May. In fact, counsel for

17

Fisher twice acknowledged at that very hearing that the court had denied Fisher's motion to add Claim XXXIV. The only issue decided on the merits at the May hearing, however, was Fisher's ineffective assistance of counsel claims. Prior to the hearing, the court told the parties "that the sole issue to be addressed at the May hearing shall be [Fisher's claims] of ineffective assistance of counsel." (J.A. at 2319.) At the May hearing, the court entertained arguments on the motion to amend because, with the exception of Claim XXXIV, all of the amendments dealt with Fisher's ineffective assistance of counsel claims. Indeed, after the parties started making arguments with respect to Claim XXXIV, the Bedford Circuit Court stated:

> As we all know, there is one very narrow issue here in this case, and I have boiled this case down to a question of ineffective assistance of counsel at the trial stage and at appeal, and that's all, and I am going to keep the evidence on that issue.

(J.A. at 2440.) It is evident, therefore, that the only issue the Bedford Circuit Court addressed on the merits at the May hearing was Fisher's ineffective assistance of counsel claims. By the time of the May hearing, it was simply too late to raise any new claims. Thus, if Fisher's motion to amend his petition with respect to Claim XXXIV was denied at the May hearing, which is undisputed, it was not denied on the merits.

Third, the Bedford Circuit Court never discussed the merits of Claim XXXIV when it denied the motion to amend in part. Fisher points, of course, to the court's comment regarding Fisher's effort to impeach the jury verdict. Fisher mistakenly cites this passage as a ruling on the motion to amend. As the district court correctly observed, however, "[a] careful reading of the . . . passage . . . reveals that the judge was not ruling on the motion to amend, but merely refusing to accept [the Thomas] affidavit[ ] into evidence." (J.A. at 3491 n.3 (emphasis omitted).) This statement, therefore, does not support Fisher's argument that the Bedford Circuit Court considered the merits of Claim XXXIV. In any event, the Bedford Circuit Court also stated that it would refuse to accept the Thomas affidavit into evidence because it was "not timely filed." (J.A. at 2714.) Thus, even if the Bedford Circuit Court's refusal to admit the Thomas affidavit into

18

evidence can be construed as the denial of the motion to amend, the court stated an adequate and independent state procedural ground for its decision.

Finally, Fisher never discussed the merits of the claim he proposed to add. In his ninth assignment of error to the Virginia Supreme Court, Fisher argued that the Bedford Circuit Court erred "in denying his motion to amend the petition to expand his [allegation] of juror misconduct." (J.A. at 2849.) Not once in his brief did Fisher assert that the Bedford Circuit Court erred in denying his motion to amend on the merits. Rather, Fisher's argument in support of his ninth assignment of error was addressed strictly to the Bedford Circuit Court's procedural ruling. Similarly, the Commonwealth's arguments in response were addressed strictly to the court's procedural ruling: "the trial court did not err in finding that petitioner's motion was untimely." (J.A. at 2871.)

In the end, we are left with the firm belief that the Bedford Circuit Court simply did not rule on the underlying merits of Claim XXXIV. Rather, we conclude, as the Commonwealth argues and the record demonstrates, that Claim XXXIV was denied as untimely.**7** Thus, the

_____

**7** The district court also concluded that the motion to amend with respect to Claim XXXIV was denied on procedural grounds. The district court concluded, however, that the Bedford Circuit Court dismissed Claim XXXIV pursuant to Slayton. As previously noted, the Bedford Circuit Court stated in its final Order that, with the exception of Fisher's ineffective assistance of counsel claims, which were rejected on the merits, all of Fisher's claims for relief were dismissed for the reasons stated in the court's opinion of March 15, 1993. Because the final Order did not state the grounds for dismissing Claim XXXIV, the district court concluded that the Bedford Circuit Court intended to dismiss Claim XXXIV for the same reason it dismissed Claim XI, which, according to its opinion of March 15, 1993, was dismissed pursuant to Slayton. We note, however, that it is undisputed that the Bedford Circuit Court denied Fisher's motion to amend his petition with respect to Claim XXXIV at the May hearing. Thus, although we regret that the Bedford Circuit Court's final Order did not state why the motion to amend was denied in part, it is clear that Claim XXXIV was never added to Fisher's habeas petition. As a consequence, Claim XXXIV never became one of Fisher's "claims" that had to be disposed of in the Bedford Circuit Court's final

19

Virginia Supreme Court's affirmance of the Bedford Circuit Court's decision to deny the motion to amend "on the merits," was simply an affirmance of the Bedford Circuit Court's decision to deny the motion on procedural grounds. As such, the allegations raised in Claim XXXIV were dismissed by the Virginia Supreme Court on procedural grounds and, therefore, Fisher is procedurally barred from raising the same allegations before us on federal habeas review absent cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. See Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice resulting therefrom, the federal courts can address the issue's merits); and Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (stating that where a petitioner has suffered a fundamental miscarriage of justice a decision on the merits is appropriate without regard to a procedural default).

Fisher contends that cause and prejudice excuse any procedural default of this claim.[8] Cause excuses the failure to raise a claim during a state proceeding if "the factual or legal basis for [the] claim was not reasonably available." McCleskey v. Zant, 499 U.S. 467, 494 (1991). Fisher contends that he could not have developed this claim in a more timely fashion because the Bedford Circuit Court's May 1990 prohibition against his interviewing the jurors from his criminal trial was not lifted until December 21, 1992. We disagree. The Bedford Circuit Court did not prohibit Fisher from interviewing the jurors who served on his jury. Rather, the court stated that Fisher could interview the jurors in question after he made the requisite showing of necessity. Fisher, however, waited over two years before asking the Bedford Circuit Court for a hearing to show necessity. Then, after receiving

_____

Order. Accordingly, Claim XXXIV could not have been denied for the reasons stated in the Bedford Circuit Court's opinion of March 15, 1993, i.e., pursuant to Slayton. Rather, as stated herein, we conclude that Fisher's motion to amend his petition with Claim XXXIV was denied as untimely.

[8] Because Fisher does not argue that he can demonstrate a fundamental miscarriage of justice to excuse the default, we do not consider whether he has, in fact, so suffered. See Kornahrens v. Evatt, 66 F.3d 1350, 1361-63 (4th Cir. 1995).

20

permission to interview the jurors from his trial, Fisher waited five months to file his motion to amend. It is the moving party's obligation to push the case forward. Fisher simply failed to pursue the allegations contained in Claim XXXIV in a timely manner. As a result, Fisher cannot demonstrate cause to overcome the procedural bar.

III.

Next, Fisher contends that his trial counsel was ineffective for (1) failing to challenge the admissibility of his taped conversations with a government witness, (2) failing to develop and present evidence to rebut the aggravating factor of future dangerousness, (3) failing to develop and present mitigating evidence, (4) opening the door to evidence of his parole eligibility status, and (5) failing to object when the burden was placed on him to prove that he should not be sentenced to death. The question of whether Fisher's counsel was ineffective is a mixed question of law and fact that we review de novo. See Griffin v. Warden, 970 F.2d 1355, 1357 (4th Cir. 1992).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-part test for reviewing claims of ineffective assistance of counsel. See id. at 690. First, Fisher must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness. See id. at 690. This, however, is no simple task. A court's review of trial counsel's performance is"highly deferential." Id. at 689. Indeed, courts must afford a strong presumption that counsel's performance was within the wide range of professionally competent assistance. See id. If Fisher is able to demonstrate that his trial counsel's performance was objectively unreasonable, he must then "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. As a result, Fisher's trial counsel may be deemed ineffective only if his "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

In Lockhart v. Fretwell, 506 U.S. 364 (1993), the Supreme Court clarified the meaning of prejudice under Strickland. See id. at 369-70. Although the Supreme Court in Strickland focused primarily on whether "the result of the proceeding would have been different,"

21

Strickland, 466 U.S. at 694, the Supreme Court in Lockhart clarified that "an analysis focusing solely on mere outcome determination . . . is defective," Lockhart, 506 U.S. at 369. Instead, a proper prejudice analysis must consider "whether the result of the proceeding was fundamentally unfair or unreliable." Id. As a result, a court may not "set aside a conviction or sentence solely because the outcome would have been different but for counsel's error." Id. at 369-70.

With these principles in mind, we review Fisher's individual claims of ineffective assistance of counsel.

A.

First, Fisher argues that his trial counsel was ineffective for failing to challenge the admissibility of six taped conversations Fisher had with government witness Gerald Steadham. On five occasions between November 29, 1985, and November 12, 1986, Steadham, wearing a recording device, met with Fisher in various Charlotte, North Carolina coffee houses. During these conversations, Fisher occasionally discussed Wilkey's death. Although two of the six tapes were recorded after Fisher was indicted and his right to counsel had attached, all six tapes were played in full at Fisher's trial.

Fisher contends that two of the tapes were obtained in clear violation of his Sixth Amendment right to counsel, see Massiah v. United States, 377 U.S. 201, 203-05 (1964), and that all of the tapes contained inadmissible evidence of Fisher's bad character and bad acts, see Miller v. Commonwealth, 422 S.E.2d 795, 801 (Va. 1992). For instance, the tapes contained Fisher's threat to kill Steadham if he did not repay a loan, Fisher's assertions that he had killed two other individuals, Fisher's derogatory remarks about women, and Fisher's incessant use of foul language. According to Fisher, counsel's failure to object to the admission of the tapes, indeed, counsel's insistence that they be played in full, rendered his assistance constitutionally ineffective.

As an initial matter, we note that Fisher's trial counsel did, in fact, object to the admission of the tapes. That objection, however, was overruled. As a result, the Commonwealth was allowed to play those portions of the tape in which Fisher discussed Wilkey's death. At no

22

point on the tapes, however, did Fisher admit to having Wilkey killed. Concerned that the jury might miss that crucial point, Fisher's trial counsel requested that the tapes, already held admissible over objection, be played in full so that the jury could understand and appreciate the context in which Fisher discussed Wilkey's death. Under these circumstances, we cannot say that counsel's insistence that the tapes be played in full was objectively unreasonable.

Although Fisher's trial counsel objected to the admission of the tapes, we note that he did not state the grounds for his objection. In particular, trial counsel did not argue that two of the tapes were inadmissible under the Sixth Amendment, and that all six tapes were inadmissible under the Virginia Rules of Evidence. Even assuming, however, that counsel's failure to state the grounds for its objection was objectively unreasonable, we conclude, for the reasons that follow, that Fisher was not prejudiced in any way by counsel's actions.

The tapes were but a small part of the prosecution's overwhelming case against Fisher. The Commonwealth's case was built primarily upon evidence of Fisher's elaborate efforts to obtain an insurance policy on Wilkey's life and upon the direct testimony of Mulligan, Steadham, and Betty Angel. Mulligan, for instance, provided the jury with a first hand account of how Fisher arranged the killing of Wilkey to look like a hunting accident. Steadham testified that Fisher admitted to having had Wilkey killed. Angel related Fisher's prediction that somebody was going to get hurt on the hunting trip. In sum, we cannot say that, but for counsel's failure to state the grounds for his objection to the tapes, there is a reasonable probability that the result of the proceeding would have been different or that the result of the proceeding was fundamentally unfair or unreliable. As a consequence, this claim is without merit.

B.

Next, Fisher contends that his trial counsel was ineffective for failing to develop and present evidence to rebut the aggravating factor of future dangerousness. In particular, Fisher claims that his trial counsel was ineffective for failing to present evidence that Fisher did not commit any of the crimes that he boasted about on the so-called Fisher-Steadham tapes. For example, on the tapes Fisher brags that he

23

was tried for murder in both Illinois and Kansas and acquitted, despite his guilt. At trial, Fisher's counsel argued that if Fisher's boasts were in fact true, that the prosecution would have presented some documentary evidence to that effect. Fisher contends that trial counsel should have obtained records from Illinois and Kansas demonstrating that he had never been charged with murder.

Even assuming that trial counsel could have obtained such documentation, Fisher was not prejudiced. The evidence that Fisher presented a future danger to society was simply overwhelming. The jury heard evidence that Fisher had already been convicted of twenty-five felonies. In addition, the jury heard evidence that Fisher either threatened, offered, or intended to kill (1) Betty Angel and her husband, (2) the boyfriend of Harold Brown's daughter, (3) the former husband of Brown's girlfriend in exchange for a share of the insurance proceeds, (4) an unidentified woman in Mexico in exchange for a share of the insurance proceeds, (5) Wilkey's girlfriend, Bonnie Jones, in exchange for a share of the insurance proceeds, (5) Mulligan, and (6) Steadham. In light of what the district court aptly described as a "mountain of future dangerousness evidence wholly unrelated to the murders that Fisher bragged about but apparently never committed," we cannot say that there is a reasonable probability that the result of the proceeding would have been different absent trial counsel's error or that the result of the proceeding was fundamentally unfair or unreliable.

C.

Fisher also asserts that his trial counsel was ineffective for failing to develop and present certain mitigating evidence. In particular, Fisher asserts that trial counsel unreasonably (1) failed to research Fisher's mental illness, (2) failed to investigate Fisher's criminal history, and (3) failed to contact Fisher's family and certain other witnesses with regard to mitigating evidence. For the reasons that follow, we conclude that counsel's actions were not constitutionally ineffective.

1.

First, the district court concluded that evidence of Fisher's mental illness would have opened the door to evidence even more damaging

24

to Fisher. We agree. Introduction of Fisher's mental health records from juvenile detention halls would have disclosed a criminal history predating the numerous adult convictions detailed by the prosecution. See Howard v. Moore, 131 F.3d 399, 421 (4th Cir. 1997) (en banc) (recognizing the danger of introducing evidence that would expose a defendant's criminal history), cert. denied, 119 S. Ct. 108 (1998). Moreover, Dr. Lee and Dr. Gwaltney both cautioned Fisher's trial counsel against introducing evidence of Fisher's mental health records as an adult. Specifically, they warned Fisher's trial counsel that, if asked on cross-examination, they would be unable to rule out the possibility that Fisher suffered from an antisocial disorder. In other words, they would have had to testify that Fisher might very well present a future danger to society. Because the jury was considering whether Fisher presented a future danger to society, we cannot say that counsel's strategic decision not to introduce Fisher's medical records was objectively unreasonable.

2.

Similarly unavailing is Fisher's claim that trial counsel failed to explain adequately the nature of his prior felonies. In particular, Fisher argues that trial counsel failed to impress upon the jury that his twenty-five prior felonies were all nonviolent. Fisher contends that a proper explanation of his criminal history would have convinced the jury that he would not commit violent crimes in the future. We disagree. In light of the facts introduced at trial relating to this crime, we agree with the district court that "it is indeed wishful thinking to argue that the nonviolent nature of his previous crimes would indicate that Fisher was not a future danger." (J.A. at 3592.) As a result, Fisher was not prejudiced by trial counsel's failure to delve further into his criminal background.

3.

Finally, with respect to Fisher's relatives, we note that Fisher advised trial counsel not only that he did not want his family to testify, but that his family could not provide any helpful information, and would, in fact, offer some very harmful information. We cannot say, therefore, that trial counsel's strategic decision not to call Fisher's family members as witnesses was objectively unreasonable. See

25

Strickland, 466 U.S. at 689 (noting presumption that conduct being challenged was an appropriate and necessary trial strategy under the circumstances); Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995) (recognizing "that strategies devised after extensively investigating the law and facts relevant to any and all probable options are virtually unchallengeable").

D.

In addition, Fisher argues that his trial counsel was ineffective for opening the door to evidence of his parole eligibility status. During the penalty phase of Fisher's trial, his counsel argued that if the jury sentenced Fisher to a term of life "he will never see the sun shine again except through bars." (J.A. at 1736.) Because counsel erroneously suggested that Fisher would be ineligible for parole, the state trial court allowed the prosecution to argue that a life sentence would not necessarily mean that Fisher would be behind bars for the rest of his life.

In both his direct appeal and his state habeas appeal, Fisher challenged the trial court's ruling allowing the prosecution to respond to his counsel's remarks concerning parole eligibility. At no point, however, did Fisher contend that his trial counsel was ineffective for opening the door to the prosecution's response. Thus, Fisher has never presented this particular ineffective assistance of counsel claim to the Virginia state courts. The Commonwealth argues that, as a result, the claim is procedurally defaulted. In the alternative, the Commonwealth contends that the claim is without merit. We agree with the Commonwealth that this claim was procedurally defaulted. As a result, we decline to address the merits.

"In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a defendant's state trial and sentencing," a state prisoner must "exhaust" all available state remedies before he can apply for federal habeas relief. Matthews v. Evatt, 105 F.3d 907, 910 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997); see also 28 U.S.C.A. § 2254(b) (West Supp. 1998) (barring the granting of habeas corpus relief "unless it appears that the applicant has exhausted the remedies available in the courts of the State"); Rose v. Lundy, 455 U.S. 509, 518 (1982) ("The exhaustion doctrine

26

is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings."). To exhaust state remedies, a habeas petitioner must present the substance of his claim to the state's highest court. See Anderson v. Harless, 459 U.S. 4, 7-8 (1982) (per curiam); Picard v. Connor, 404 U.S. 270, 275-78 (1971); Matthews, 105 F.3d at 911. A procedural default occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

It is undisputed that Fisher failed to present the substance of this claim to the Virginia Supreme Court. As a result, Fisher failed to satisfy the exhaustion requirement. Moreover, if Fisher presented this claim to the Virginia Supreme Court for the first time at this juncture, the claim would be procedurally barred pursuant to Va. Code Ann. § 8.01-654(B)(2) (Michie Supp. 1998). Under § 8.01-654(B)(2), "a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." Hoke v. Netherland, 92 F.3d 1350, 1354 n.1 (4th Cir.) (internal quotation marks omitted), cert. denied, 117 S. Ct. 630 (1996); see also Va. Code Ann. § 8.01-654(B)(2) ("No writ [of habeas corpus] shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."). Accordingly, we conclude that this claim is procedurally defaulted. See Gray v. Netherland, 116 S. Ct. 2074, 2080-81 (1996).

We may excuse Fisher's procedural default, however, if he can demonstrate cause for, and resulting prejudice from, the default or that he has suffered a fundamental miscarriage of justice. See Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice resulting therefrom, the federal courts can address the issue's merits); Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (stating that where a petitioner has suffered a fundamental miscarriage of justice a decision on the merits is appropriate without regard to a procedural default). Because Fisher has not established either, his claim is not cognizable in a federal habeas petition. See Coleman, 501 U.S. at 750.

27

E.

At the close of the sentencing phase of Fisher's trial, the jury recommended that Fisher be sentenced to death. As a result, the trial court conducted a post-trial hearing pursuant to Va. Code Ann. § 19.2-264.5 (Michie 1995) (requiring trial judge to determine whether the jury's recommendation "of death is appropriate and just"). Fisher contends that his trial counsel was ineffective in asking the trial court to place the burden on him at this hearing to prove that he should not be sentenced to death. Assuming that Fisher's trial counsel was objectively unreasonable in so asking, Fisher was simply not prejudiced by his counsel's request. Despite Fisher's contentions to the contrary, the trial court never allowed the burden to be assumed by Fisher. As the district court noted, "[t]here was no burden shifting here, and even a cursory reading of the record . . . reveals that fact." (J.A. at 3597.) Accordingly, this argument is without merit.

IV.

Next, Fisher argues that the cumulative effect of his trial counsel's individual actions deprived him of a fair trial. We disagree. Having just determined that none of counsel's actions could be considered constitutional error, see Lockhart v. Fretwell , 506 U.S. 364, 369 n.2 (1993) ("[U]nder Strickland v. Washington , 466 U.S. 668 (1984), an error of constitutional magnitude occurs in the Sixth Amendment context only if the defendant demonstrates (1) deficient performance and (2) prejudice." (emphasis added)), it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived Fisher of a fair trial. Not surprisingly, it has long been the practice of this Court individually to assess claims under Strickland v. Washington, 466 U.S. 668 (1984). See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir. 1986) (considering ineffective assistance claims individually rather than considering their cumulative impact). In fact, in Arnold v. Evatt, 113 F.3d 1352 (4th Cir. 1997), cert. denied, 118 S. Ct. 715 (1998), this Court recently rejected a similar request to review the alleged errors of a trial court cumulatively rather than individually. See id. at 1364 ("Based on the findings of this court concerning the individual claims of error, we reject this claim.").

28

To the extent this Court has not specifically stated that ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively, we do so now.**9** In so holding, we are in agreement with the majority of our sister circuits that have considered the issue. For example, in Wainwright v. Lockhart, 80 F.3d 1226 (8th Cir.), cert. denied, 117 S. Ct. 395 (1996), the Eighth Circuit expressly held that an attorney's acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation." Id. at 1233; see also Jones v. Stotts, 59 F.3d 143, 147 (10th Cir. 1995) (noting that cumulative-error analysis evaluates only effect of matters determined to be error, not cumulative effect of non-errors); United States v. Stewart, 20 F.3d 911, 917-18 (8th Cir. 1994) (same); United States v. Guiterrez, 995 F.2d 169, 173 (9th Cir. 1993) (same). But see Williams v. Washington, 59 F.3d 673, 682 (7th Cir. 1995) (stating that "a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was [prejudicial]"); Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991) (noting that a "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions"). Accordingly, the district court did not err in refusing to grant habeas relief on this claim.

V.

Fisher also contends that his court-appointed mental health experts were constitutionally ineffective. In Pruett v. Thompson, 996 F.2d 1560, 1573 n.12 (4th Cir. 1993); Poyner v. Murray, 964 F.2d 1404, 1418-19 (4th Cir. 1992), and Waye v. Murray, 884 F.2d 765, 766-67

_____

**9** Fisher relies, in part, on cases considering the cumulative effect of matters actually determined to be constitutional error. In these cases, however, the courts in question merely aggregated all of the actual constitutional errors that individually had been found to be harmless, and therefore not reversible, and analyzed whether their cumulative effect on the outcome of the trial was such that collectively they could no longer be determined to be harmless. See, e.g., United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990). Thus, legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient.

29

(4th Cir. 1989) (per curiam), this Court expressly held that there is no right under the Constitution to effective assistance of expert witnesses distinct from the right to effective assistance of counsel.[10] Rather, the rule is that the Due Process Clause requires that the Commonwealth appoint a competent expert witness to evaluate the defendant's mental state when it is in serious question and the defendant is indigent. See Ake v. Oklahoma, 470 U.S. 68, 82-83 (1985). As a result, Fisher's claim that his court-appointed mental health experts were ineffective is not cognizable in a federal habeas petition. See Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (noting that federal habeas review is limited to "violations of the United States Constitution or its laws and treaties"), cert. denied , 118 S. Ct. 83 (1997).

To the extent Fisher claims that his court-appointed mental health experts failed to discharge their constitutional duty under Ake, we agree with the district court that Fisher is procedurally barred from raising the claim before us on federal habeas review. Fisher raised this issue for the first time in his state habeas petition. As a result, the Virginia Supreme Court dismissed this claim as procedurally defaulted pursuant to Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974) (holding that claims that could have been raised on direct appeal, but were not, cannot be raised for the first time on state collateral review).

As noted above, it is well settled that a federal habeas court may not review a claim when a state court has declined to consider its merits on the basis of an adequate and independent state procedural rule. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991) (holding that a claim dismissed on a state procedural rule is procedurally barred on federal habeas review); Harris v. Reed, 489 U.S. 255, 262 (1989) (same). A rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985). We have repeatedly recognized that "the procedural default rule set forth in Slayton constitutes an adequate and independent state law ground for decision." Mu'Min v. Pruett, 125 F.3d 192, 196 (4th Cir.), cert. denied,

_____

[10] Even if this Court were to conclude that such a right exists under the Constitution, we would be prohibited by Teague v. Lane, 489 U.S. 288, 311-13 (1989), from applying the rule here.

30

118 S. Ct. 438 (1997); see also Bennett v. Angelone, 92 F.3d 1336, 1343 (4th Cir.), cert. denied, 117 S. Ct. 503 (1996); Spencer v. Murray, 18 F.3d 229, 232 (4th Cir. 1994).

Therefore, absent cause and prejudice or a miscarriage of justice to excuse the procedural default, we may not review Fisher's claim of an Ake violation because the Virginia Supreme Court declined to consider its merits upon the basis of an adequate and independent state procedural rule. See Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice resulting therefrom, the federal courts can address the issue's merits); Murray v. Carrier , 477 U.S. 478, 495-96 (1986) (stating that where a petitioner has suffered a fundamental miscarriage of justice a decision on the merits is appropriate without regard to a procedural default). Here, Fisher contends that cause and prejudice excuse any procedural default of this claim.

Cause excuses the failure to raise a claim during a state proceeding if "the factual or legal basis for [the] claim was not reasonably available." McCleskey v. Zant, 499 U.S. 467, 494 (1991). Fisher contends that it is simply not possible to raise an Ake claim on direct appeal.[11] We disagree. The record reflects that Fisher could have raised this claim on direct appeal. There was no state law barrier preventing Fisher from raising an Ake claim on direct appeal. Indeed, the Virginia Supreme Court has entertained similar arguments on direct appeal in the past. See, e.g., Pruett v. Commonwealth, 351 S.E.2d 1, 6-7 (Va. 1986) (reviewing on direct appeal claim that mental health expert's evaluation of defendant was inadequate). Moreover, the essential facts underlying the claim were known or should have been known by Fisher's appellate counsel.

_____

[11] Because Fisher contends that it is simply not possible to raise an Ake claim on direct appeal, he seemingly suggests that the Virginia Supreme Court erred in applying Slayton to this claim. As noted in part II.A, a federal habeas court does not review the application of state law. See Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995). Rather, after determining that a state court relied on an adequate and independent state-law ground for decision, we "may only inquire into whether cause and prejudice exist to excuse [a state procedural] default, not into whether the state court properly applied its own law." Id.

VI.

Finally, Fisher argues that the Virginia Supreme Court failed to review his sentence for proportionality. In particular, Fisher contends that prior to his trial, no defendant accused of murder for hire in Virginia had ever been tried for capital murder, much less sentenced to death. Because Virginia has had numerous cases of murder for hire, Fisher contends that his sentence is grossly disproportionate.

Although proportionality review is not required by the United States Constitution, see Pulley v. Harris, 465 U.S. 37, 51-53 (1984), it was required under Virginia law at the time of Fisher's direct appeal, see Va. Code Ann. § 17-110.1(C)(2) (Michie 1996) (providing that the Virginia Supreme Court must determine"[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant"). Fisher's contention -- that the Virginia Supreme Court failed to review his sentence for proportionality -- reduces, in essence, to a claim that the Virginia Supreme Court failed to apply its own law to the facts of his case.

It is well established "that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, "basic principles of federalism permit us to review only those state-court decisions that implicate federal constitutional rights." Kornahrens v. Evatt, 66 F.3d 1350, 1357 (4th Cir. 1995) (emphasis added); see also Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (stating that federal habeas review is limited to "violations of the United States Constitution or its laws and treaties"), cert. denied, 118 S. Ct. 83 (1997). As noted above, proportionality review is required by Virginia law, not the United States Constitution. Thus, absent specific evidence that the procedures used by the Virginia Supreme Court in deciding Fisher's appeal constituted an independent due process violation, see Evitts v. Lucey, 469 U.S. 387, 393 (1985); cf. Lewis v. Jeffers, 497 U.S. 764, 780 (1990), we will not entertain Fisher's contention that the Virginia Supreme Court failed to follow Virginia law, see Buchanan v. Angelone, 103 F.3d 344, 351 (4th Cir. 1996) (refusing to entertain claim that the Virginia Supreme Court's proportionality review was inadequate), aff'd 118 S. Ct. 757 (1998); see also

32

Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998) (refusing to entertain claim that Virginia law divested state circuit court of jurisdiction over several counts); Smith v. Moore, 137 F.3d 808, 822 (4th Cir. 1998) (refusing to entertain claim that jury instruction misstated South Carolina law).

VII.

Because Fisher has failed to make out a "substantial showing of the denial of [a] federal right," Barefoot v. Estelle, 463 U.S. 880, 893 (1983), we deny his application for a certificate of probable cause and dismiss this appeal.

DISMISSED

33